PUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

FIRST UNION COMMERCIAL
CORPORATION; AMERICAN EXPRESS
BANK, LIMITED,
                        *Plaintiffs-Appellees,*

                and

FIRST SECURITY LEASING COMPANY,
                        *Plaintiff,*                          No. 02-1823

                v.

GATX CAPITAL CORPORATION,
formerly known as GATX Leasing
Corporation,
                        *Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of North Carolina, at Charlotte.
Carl Horn, III, Chief Magistrate Judge.
(CA-99-152-H)

Argued: April 3, 2003

Decided: June 16, 2005

Before WIDENER, NIEMEYER, and GREGORY, Circuit Judges.

Affirmed by published opinion. Judge Widener wrote the opinion, in
which Judge Niemeyer and Judge Gregory concurred.

## COUNSEL

**ARGUED:** George Joseph Frost, HOSIE, FROST, LARGE &
MCCARTHUR, San Francisco, California, for Appellant. Charles

Evans Johnson, ROBINSON, BRADSHAW & HINSON, P.A., Charlotte, North Carolina; Bruce G. Paulsen, SEWARD & KISSEL, L.L.P., New York, New York, for Appellees. **ON BRIEF:** G. Kirkland Hardymon, RAYBURN, COOPER & DURHAM, P.A., Charlotte, North Carolina, for Appellant. Michele S. Kayne, SEWARD & KISSEL, L.L.P., New York, New York, for Appellees.

---

**OPINION**

WIDENER, Circuit Judge:

I.

This case involves a contractual dispute between plaintiffs, First Union Commercial Corporation (First Union) and American Express Bank (AMEX), and defendant, GATX Capital Corporation (GATX), regarding the sale of an oil tanker, the *SS Charles Pigott* (*Pigott*). The parties filed various claims in tort and contract against each other in the Western District of North Carolina. The parties consented to trial before a magistrate judge under 28 U.S.C. § 636(c), and the case was assigned to Chief United States Magistrate Judge Carl Horn. After a one-week trial, the jury returned a verdict in favor of GATX and against plaintiffs. The jury awarded damages of $69,711.47 against First Union and $160.338.28 against American Express. The defendant appeals the order of the trial court denying its motion to enlarge the damage award. Defendant also challenges the trial court's denial of its motion for prejudgment interest against First Union. For the reasons stated below, we affirm the judgment of the trial court.

II.

Plaintiffs First Union* and AMEX were two of five equity owners

---

*The original equity owners and their respective ownership shares were AMEX (29.4875%), First Security (25.641%), Banc One (12.8205%), PNC (19.2305%), and Union Trust (12.8205%). On November 29, 1997, plaintiff First Union succeeded Union Trust in its interest in the trust.

(collectively equity owners) of a trust which possessed as its sole asset the *Pigott*. Defendant GATX is the successor-in-interest of ITEL Leasing Company (ITEL). In 1972, the equity owners and Western Transnav Company (Transnav) entered into a 25-year bareboat charter agreement for Transnav to lease the *Pigott*. ITEL organized the charter agreement, and each of the five equity owners entered into letter agreements with ITEL detailing the method for compensating ITEL for its services. The letter agreements provided for each equity owner to make an initial payment to ITEL at the time of the charter agreement between Transnav and the equity owners. The letter agreements also provided that when the *Pigott* was sold or rechartered, ITEL would act as remarketing agent for the *Pigott* and would receive a subsequent fee based on the consideration for the resale or recharter of the *Pigott*. Disagreements regarding ITEL's subsequent remarketing duties and the compensation owed by the equity owners to ITEL's successor-in-interest, GATX, are the subject of this litigation.

Plaintiffs assert that because the original charter agreement expired on December 31, 1998, and because failure to recharter or dispose of the *Pigott* would have caused the equity owners to incur substantial storage and maintenance fees, the equity owners were eager to sell the vessel before December 1998. Between January and March 1998, Chevron Shipping Company (Chevron), an affiliate of Transnav, offered to purchase the equity owners' interest in the *Pigott* trust. Chevron made individual offers to First Union, AMEX, First Security, and Banc One equivalent to a total purchase price of $4.8 million for the vessel. Sometime between February and April of 1998, GATX, as the successor to ITEL, contacted the equity owners and asserted its right to act as sole remarketing agent for the sale of the *Pigott*. GATX, through remarketing representative Reid Scheidt (Scheidt), asserted that Chevron's initial offer was "drastically below the current market for the ship" and that the value of the *Pigott* was closer to a range of between $8 and $14 million.

Disputes between the parties followed. Plaintiffs maintain that GATX failed to provide any meaningful remarketing assistance and also interfered with Chevron's initial offer in its attempt to secure its remarketing fees. GATX contested plaintiffs' accusations and countered that plaintiffs interfered and sought to exclude GATX from negotiations to avoid paying remarketing fees.

Evidence was presented that the equity owners initially sought to exclude GATX from the remarketing process to avoid paying remarketing fees to GATX. While the parties disagree at to when the equity owners agreed to recognize GATX as the *Pigott*'s remarketing agent, plaintiffs signed documents officially authorizing GATX to act on their behalf in remarketing the *Pigott* in September 1998.

On September 9, 1998, Scheidt wrote the equity owners a letter indicating that GATX was willing and able to perform its remarketing duties and that it was seeking to reach a "consensus on the direction of the remarketing" from the equity owners. He reasserted the right of GATX to act as sole remarketing agent and stated, "no matter what the outcome of the remarketing of the Vessels under the Agreements, or the extent, if any, of the services rendered by GATX in connection with that remarketing, GATX is entitled to receive its portion of the residual proceeds as provided under the Agreements."

On September 10, 1998, James Peters, on behalf of equity owner First Security Leasing, responded to Scheidt's letter, stating that "[i]n reading through your letter, the focus appears to be more on the fee than in what GATX can bring to the table that can benefit the equity owners." The letter continued stating, that First Security Leasing was "relying heavily upon the experience and expertise of GATX in determining the current tanker market value and obtaining additional offers," noting that the equity owners had not "received offers other than the ones that came from Chevron directly" which Chevron had withdrawn because it was "reluctant to do business or negotiate with GATX." Peters requested that GATX perform under the contract by soliciting a higher offer from Chevron, obtaining other offers to purchase the *Pigott*, or offering to purchase the *Pigott* itself.

Other than an uncommunicated offer by Chevron to purchase the *Pigott* for $4 million on October 12, 1998, GATX secured no viable offers to purchase the *Pigott*. Plaintiffs maintain that during a November 10, 1998, conference call between Scheidt and the equity owners, the equity owners voiced concern over Chevron's expired offer and the absence of other potential buyers. During the call, Scheidt offered to step away from his remarketing activities and allow the equity owners to try to sell the *Pigott* on their own.

Thereafter, GATX discontinued its remarketing activities, and AMEX's Miss Elizabeth Haraym contacted Chevron on behalf of the equity owners to restart negotiations for purchase of the *Pigott*. On December 29, 1998, the equity owners sold their interest in the *Pigott* to Chevron for $4.35 million—some $450,000 less than the initial amount offered by Chevron. By invoices dated January 12, 1999, GATX requested payment of $641,353 from AMEX and $278,845 from First Union, an amount equivalent to one half of the gross proceeds received by the plaintiffs from *Pigott*'s sale.

On April 29, 1999, plaintiffs filed this lawsuit in federal court requesting declaratory judgment that they owed nothing to GATX and asserting claims for damages in contract and tort. Plaintiffs contended that GATX failed to perform its contractual remarketing duties in good faith and that GATX was not owed additional compensation because the final sale price did not exceed the formula provided in the letter agreements. First Union and AMEX requested damages of $63,308 and $317,293, respectively.

On November 29, 1999, GATX filed its answer denying liability and filed counterclaims alleging breach of contract and breach of covenant of good faith and fair dealing. GATX asserted that plaintiffs prevented GATX from acting as the *Pigott*'s remarketing agent to avoid paying remarketing fees. GATX maintained that under the letter agreements, it was entitled to fifty percent of the gross proceeds received by AMEX and First Union from the sale of the *Pigott*.

With the exception of plaintiffs' unfair and deceptive trade practice claim which was denied at the close of plaintiffs' evidence, all the parties' claims were submitted to a jury after a one-week trial. After two hours' deliberation, the jury asked the court, "If we decide to award damages, can we award any amount between one dollar and the amount requested by the damaged parties?" After consultation with counsel for all parties, the trial court returned with the agreed answer of "yes."

On plaintiffs' claims of breach of contract, breach of fiduciary duty, and negligent misrepresentation against GATX, the jury returned its verdict in favor of GATX. On GATX's counterclaims of breach of contract and bad faith against plaintiffs, the jury returned

a verdict finding plaintiffs liable. However, the jury's damage award to GATX of $160,338.28 against American Express and $69,711.47 against First Union was some seventy-five percent lower than the amount claimed by GATX under the letter agreements.

Pursuant to Rule 50(b), GATX moved to enlarge the damage award to the amount GATX claimed it was owed in the invoices. The trial court denied GATX's motion stating that the jury's verdict and its award of damages was reasonable.

In addition, GATX requested that the court award both postjudgment and prejudgment interest against both plaintiffs. The court agreed that postjudgment interest was proper and entered an appropriate order. With regard to prejudgment interest, the trial court determined that the claims against AMEX were controlled by New York law which required the award of prejudgment interest on the judgment against AMEX. However, because the claims against First Union were governed by Maryland law, prejudgment interest was not mandatory, and the trial court exercised its discretion and declined to award prejudgment interest against First Union.

GATX now appeals, urging that the trial court erred in not increasing the damage award and not awarding prejudgment interest.

### III.

GATX contends that the trial court erred in denying its Rule 50(b) motion for judgment notwithstanding the verdict. The denial of a Rule 50(b) is reviewed *de novo*. *Konkel v. Bob Evans Farms*, 165 F.3d 275, 279 (4th Cir. 1999). "If, viewing the facts in the light most favorable to the non-moving party, there is sufficient evidence for a reasonable jury to have found in [the non-moving party's] favor, we are constrained to affirm the jury verdict." *Lack v. Wal-Mart Stores*, 240 F.3d 255, 259 (4th Cir. 2001). On such appellate review we determine if a reasonable jury could have found the verdict. We do not weigh evidence nor judge the credibility of witnesses. See *Trimed, Inc. v. Sherwood Med. Co.*, 977 F.2d 885, 888 (4th Cir. 1992).

We review a party's challenge to the adequacy of a damage award using the same general principles applied when a party challenges a

damage award as excessive. *Great Coastal Exp. v. Int'l Broth. of Teamsters, Chauffeurs, Warehousemen and Helpers*, 511 F.2d 839, 846 (4th Cir. 1975); *De Foe v. Duhl*, 286 F.2d 205, 207 (4th Cir. 1961). Where, as here, a party seeks to preserve the jury's liability determination in its favor while challenging the jury's damage award as inadequate, we are reminded that "[t]he assessment of damages is entrusted to the jury, and is not subject to review unless unconscionable or motivated by extreme prejudice." *Compton v. Wyle Labs.*, 674 F.2d 206, 209 (4th Cir. 1982); see also *Barber v. Whirlpool Corp.*, 34 F.3d 1268, 1279 (4th Cir. 1994). The court will uphold a damage award "unless no substantial evidence is presented to support it, it is against the clear weight of the evidence, it is based upon evidence that is false, or it will result in a miscarriage of justice." *Barber*, 34 F.3d at 1279.

GATX contends that because the jury found in its favor on all claims, the evidence supports only a damage award equal to or greater than the invoiced amounts under the letter agreements. We disagree. The award returned by the jury was consistent with the supplemental jury instruction given to the jury with the agreement of counsel. As noted, during deliberations, the jury asked the court "If we decide to award damages, can we award any amount between one dollar and the amount requested by the damaged parties?" Not knowing at that moment whether the jury had decided either the winner or the amount of any damages, counsel for GATX and both plaintiffs answered "yes," and the jury was so instructed, without qualification, that it could award any amount of damages between the described range.

Rule 51 of the Federal Rules of Civil Procedure provides: "No party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict. . . ." Fed. R. Civ. Proc. 51 (2003)(amended 2003). By agreeing to an instruction which specifically authorized the verdict returned by the jury, GATX waived its right to argue on appeal that the jury was required to award a greater amount.

To the extent that GATX contends that the law of the case required the jury to award a specific damage amount when it found in GATX's favor, the argument represents an "indirect attack[ ] on the [supple-

mental] damage instructions given to the jury" which will not be entertained. See *Bogan v. Stroud*, 958 F.2d 180, 184 (7th Cir. 1992).

Moreover, our review of the record persuades us that ample evidence supports the jury's damage award. In this case, the jury found plaintiffs materially breached the parties' contract. While GATX correctly asserts that the jury found that it did not materially breach the parties' letter agreements, GATX incorrectly assumes that this finding denotes that the jury also found that it performed all its duties fully and adequately under the letter agreements. The court instructed the jury that a party damaged by another party's breach

> has a duty under the law to use reasonable diligence under the circumstances to mitigate or minimize damages. The law imposes on an injured person the duty to take advantage of reasonable opportunities it may have to prevent the aggregation of his injuries so as to reduce or minimize loss or damage.

The court continued by instructing that the prevailing party could not "recover for any item of damage he could have avoided through such reasonable efforts."

While the jury agreed with GATX's assertion that plaintiffs materially breached the letter agreements, the jury's verdict is also consistent with a finding that for a considerable time before the *Pigott*'s sale, plaintiffs agreed to allow GATX to act as the *Pigott*'s remarketing agent and that GATX failed to use this opportunity to mitigate its damages. Rather than soliciting offers to purchase the *Pigott* at levels consistent with GATX's representation of the *Pigott*'s true market value, GATX pursued a remarketing strategy that ultimately led to plaintiffs receiving almost half a million dollars less than the amount Chevron originally offered, and almost $10 million less than GATX's highest market value estimation.

The jury was also presented with substantial evidence that after the plaintiffs authorized GATX to act as their remarketing agent, GATX's contributions to the sale of the *Pigott* were minimal and even hampered the equity owner's remarketing efforts. Viewed in the light most favorable to plaintiffs, GATX's valuation of the *Pigott* at

between $8 and $14 million was overinflated, souring the negotiating atmosphere and causing Chevron to withdraw its offer to purchase the *Pigott*. GATX also failed to produce any competitive offers to purchase the *Pigott*. In fact, GATX's only offer to purchase the *Pigott* came from Chevron in October 1998 which GATX allowed to expire before communicating it to the equity owners. Finally, GATX stepped away from its remarketing duties in November 1998 forcing the equity owners to negotiate with Chevron on their own and to sell the *Pigott* for less than Chevron's initial offer. Viewing this evidence in the light most favorable to the plaintiffs, the jury could have reasonably determined that GATX's failed to mitigate damages by completely and capably assuming its remarketing duties even after plaintiffs formally accepted GATX as their remarketing agent, and that the failure to mitigate resulted in lower damages to GATX, warranting a damage award less than that claimed by GATX.

We are thus of opinion and hold that the verdict of the jury was supported by substantial evidence; that it was neither unconscionable nor motivated by extreme prejudice, *Compton*, 674 F.2d at 209; and that it was not against the clear weight of the evidence or based upon evidence that was false or resulted in a miscarriage of justice, *Barber*, 34 F.3d at 1279.

IV.

Finally, GATX argues that the trial court abused its discretion in declining to award prejudgment interest to GATX on the damage award against First Union. Maryland law, which governs the award of prejudgment interest against First Union, vests discretion to the trial court in awarding prejudgment interest. *I.W. Berman Props. v. Porter Bros.*, 344 A.2d 65, 76 (Md. 1975). Where, as here, the liability issues were fiercely contested by the parties and the damages owed to GATX were not certain prior to the judgment, we are of opinion that the district court did not abuse its discretion in declining to award prejudgment interest.

The judgment of the district court is accordingly

*AFFIRMED*.