**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 12-2256**
_____

LIBERTY MUTUAL FIRE INSURANCE COMPANY; EMPLOYERS INSURANCE
OF WAUSAU, a mutual company,

Plaintiffs - Appellees,

v.

JT WALKER INDUSTRIES, INC., f/k/a Metal Industries, Inc.; MI
WINDOWS & DOORS, INC., f/k/a MI Home Products, Inc., f/k/a
Metal Industries, Inc. of California,

Defendants - Appellants.

_____

**No. 12-2350**
_____

LIBERTY MUTUAL FIRE INSURANCE COMPANY; EMPLOYERS INSURANCE
OF WAUSAU, a mutual company, now known as Employers
Insurance Company of Wausau,

Plaintiffs - Appellants,

v.

JT WALKER INDUSTRIES, INC., f/k/a Metal Industries, Inc.; MI
WINDOWS & DOORS, INC., f/k/a MI Home Products, Inc., f/k/a
Metal Industries, Inc. of California,

Defendants - Appellees.

_____

Appeals from the United States District Court for the District
of South Carolina, at Charleston.   Margaret B. Seymour, Chief
District Judge.   (2:08-cv-02043-MBS)

_____

Argued: November 6, 2013          Decided: February 10, 2014

_____

Before GREGORY, DAVIS, and THACKER, Circuit Judges.

_____

Affirmed in part, vacated in part, and remanded by unpublished opinion. Judge Gregory wrote the opinion, in which Judge Davis and Judge Thacker joined. Judge Davis wrote a separate concurring opinion.

_____

**ARGUED:** Richard Hugh Lumpkin, VER PLOEG & LUMPKIN, P.A., Miami, Florida, for Appellants/Cross-Appellees. Charles Mitchell Brown, NELSON MULLINS RILEY & SCARBOROUGH, LLP, Columbia, South Carolina, for Appellees/Cross-Appellants. **ON BRIEF:** Meghan C. Moore, W. Allen Bonner, VER PLOEG & LUMPKIN, P.A., Miami, Florida; William K. Davis, Alan M. Ruley, BELL, DAVIS & PITT, P.A., Winston-Salem, North Carolina, for Appellants/Cross-Appellees. William C. Wood, Jr., NELSON MULLINS RILEY & SCARBOROUGH LLP, Columbia, South Carolina; Morgan S. Templeton, WALL TEMPLETON & HALDRUP, PA, Charleston, South Carolina; J. Mark Langdon, ELMORE AND WALL, Raleigh, North Carolina, for Appellees/Cross-Appellants.

_____

Unpublished opinions are not binding precedent in this circuit.

GREGORY, Circuit Judge:

Liberty Mutual Fire Insurance Company ("Liberty") filed an action in the district court seeking reimbursement under its insurance policies after settling five product defect lawsuits. Liberty insured J.T. Walker Industries, Inc. and its subsidiary MI Windows & Doors, Inc. (collectively, "MI"), named defendants in the product defect actions. Despite MI's insistence on taking the cases to trial, Liberty settled all five cases within the deductible limits of the applicable insurance policies. MI refused to pay the costs of settlements it did not desire. When Liberty sued for breach of contract, MI filed counterclaims alleging that Liberty breached both the explicit terms of the insurance policies and the implied covenant of good faith and fair dealing.

A jury found both parties liable for contract damages and also found Liberty liable for actual and punitive damages on MI's bad faith claim. The district court set aside the bad faith damages, finding that MI failed to prove actual damages and, as a result, was not entitled to punitive damages. The district court affirmed the verdict as to the breaches of contract, and refused to award litigation costs and prejudgment interest. The parties now appeal the post-trial rulings and evidentiary issues. For the reasons stated below, we affirm the

3

district court's ruling on all issues except bad faith damages. We vacate the ruling on punitive damages and remand.

I.

A.

MI has manufactured windows and doors for nearly sixty years. Throughout that time, MI purchased various insurance policies, providing general liability, umbrella, and excess coverage. Between 1997 and 2003, Liberty insured MI under six annual commercial general liability insurance policies ("the Policies"). The Policies conferred upon Liberty the duty and right to defend MI against lawsuits claiming property damage. They also vested in Liberty the discretion to "investigate any occurrence and settle any claim or suit that may result."

Each policy contained a $2,000,000 aggregate limit, with a limit of $1,000,000 per occurrence. The Policies also provided for a $500,000 deductible, requiring MI to reimburse Liberty up to that amount for any defense and indemnity costs incurred per occurrence. The Policies established claim handling fees, with charges ranging from $625 to $967 for each claim file Liberty opened in relation to MI's coverage.

B.

During the time period covered by the Policies, MI was a named defendant in five property damage lawsuits in South

4

Carolina. Each suit alleged that, _inter alia_, defective manufacturing and installation of MI windows and doors led to progressive water damage in five condominium developments. The plaintiffs in each suit were the individual homeowners and the respective homeowners' associations for each development. The plaintiffs sued MI alongside other contractors and developers involved in constructing the condominiums, alleging millions of dollars in damages for each lawsuit. The five suits were: Avian Forest, Tilghman Shores, Riverwalk, Magnolia North, and Marais.[1]

MI tendered each suit to Liberty, which agreed to defend MI in all five cases. Liberty retained counsel to represent MI's interests in each of the underlying lawsuits. Finley Clarke served as counsel in four cases, and Scott Taylor served as counsel in Magnolia North due to Clarke's conflict in that case. MI involved its national outside counsel, Paul Gary, in each case. Defense counsel in the underlying cases prepared and

---

[1] Avian Forest Homeowners' Ass'n v. MI Windows & Doors, Inc. et al., CA No. 02-CP-22-0687, Horry County, South Carolina; Tilghman Shores Homeowners' Ass'n v. MI Windows, et al., CA No 03-CP-26-4021, Horry County, South Carolina; Riverwalk at Arrowhead Country Club Prop. Owners' Ass'n, Inc. v. MI Home Products, et al., CA No. 03-CP-26-7169, Horry County, South Carolina; Magnolia N. Homeowners Ass'n v. MI Windows, et al., CA No. 05-CP-26-0044, Horry County, South Carolina; Marais Prop. Owners' Ass'n v. MI Windows, et al., CA No. 05-CP-10-1140, Charleston County, South Carolina.

presented reports for Liberty, MI, and Gary. During the underlying litigation, MI expressed its position, through Gary, that it desired to defend the reputation of its products and avoid settling meritless cases, lest it become an easy target for suits related to other buildings or developments.

After receiving the cases, Liberty set a reserve for each case -- an estimate of losses due to MI's potential exposure. Liberty set the reserves based upon the facts of each claim and adjusted the amounts to reflect any new information it received. Liberty used these figures to inform an evaluation of whether a given case should be tried or settled. The aggregate reserve total amounted to $475,000. Liberty also estimated costs of defending each case through trial, eventually allocating $769,310 for defense costs. Based on the evidence, these estimates, the nature of the claims, and the potential for joint and several liability, Liberty settled each of the five underlying lawsuits, despite MI's desire to proceed to trial on four of them.

Avian Forest settled first. Liberty set the Avian Forest reserve at $300,000 and estimated $96,250 in defense costs. Clarke estimated the potential liability to be between $3 million and $7 million. Clarke expressed confidence that summary judgment would not resolve the case. The plaintiffs in the case retained three sets of experts prepared to fault MI for

6

the property damages based on the quality of its windows. Being that the jury verdict would turn on whichever set of experts the jury found more credible, Clarke considered MI's likelihood of a favorable jury verdict to be no better than fifty percent.

Approximately one week before trial was to commence, MI learned that the claims adjuster authorized Liberty to settle MI's portion of the Avian Forest claims. MI objected to settlement, stating its intent to reject Liberty's defense and assume control of the defense through trial. In response, Liberty offered MI an opportunity to withdraw the claim for coverage, whereupon Liberty would cede full control of the defense to MI. Doing so would have released Liberty from any liability and caused MI to assume the risk of a verdict greater than the settlement amount. MI refused to release Liberty from its coverage obligations. Liberty settled Avian Forest one day later for $72,300.[2]

In Tilghman Shores, Liberty set a reserve of $75,000 and estimated $65,000 for defense costs. Clarke estimated potential liability in the vicinity of $6 million, not including punitive damages. He estimated settlement would cost between $300,000 and $500,000. Just as with Avian Forest, Clarke found no

---

[2] The developer in Avian Forest proceeded to trial, where a jury returned a verdict in the plaintiffs' favor and awarded $2.2 million in damages. (J.A. 771, 2125.)

possibility of a favorable summary judgment resolution and estimated no more than a fifty percent chance for a favorable jury verdict. Liberty settled Tilghman Shores for $75,000.

The next two cases, Riverwalk and Magnolia North, settled simultaneously for $400,000. For Riverwalk, Liberty estimated defense costs at $125,000 but set the reserve at $0. Clarke expressed concern that an adverse verdict in Riverwalk could result in joint and several liability between $7 million to $10 million. He doubted the possibility of a favorable summary judgment disposition, and estimated no better than a fifty percent chance of a favorable jury verdict. He also expressed concern that MI's windows in nine of the Riverwalk buildings would not meet applicable building codes. Liberty settled Riverwalk for $200,000.

In Magnolia North, Liberty estimated defense costs at $192,000 and set a reserve of $50,000. Taylor estimated damages upwards of $10 million, with an additional $3.8 million for the individual homeowners' loss-of-use claims. He was certain the conflicting expert reports would preclude summary judgment. Taylor also believed MI held a fifty percent chance of a favorable verdict if the developer remained a co-defendant. He held no expectation that the developer, who suffered a multi-million dollar liability in the Avian Forest trial, would settle

8

prior to trial in Magnolia North.[3]  Liberty settled Magnolia North at the same time as Riverwalk and for the same amount -- $200,000.

The final case, Marais, was the only one for which MI expressed a desire to settle.  Upon defense counsel's advice, Liberty estimated $291,000 for defense costs and set a reserve of $50,000.  MI accepted some level of responsibility for damage due to its failure to remedy an improper installation.  MI sought a $150,000 settlement.  According to Clarke, the plaintiffs sought more than $20 million from all defendants.  The mediator in the case estimated settlement would require between $7 million and $10 million.  Liberty settled MI's portion of the Marais case for $500,000.  Liberty paid $210,000 of that amount and allocated the remaining $290,000 to Zurich, MI's succeeding insurance carrier.

Being that each claim settled for no more than $500,000, Liberty sought reimbursement from MI for the full settlement amounts in accordance with the deductible under the Policies. Liberty also requested fees for opening twenty-six processing claims in connection with the lawsuits.  Having intended to go

---

[3] The same developer was also found liable for $4.3 million in damages in a suit with another condominium development. (J.A. 771-78, 2125-26.)

to trial and exonerate its products, MI refused to submit the requested amounts.

C.

Liberty filed this diversity action in the United States District Court for the District of South Carolina. Liberty sought declaratory relief concerning the trigger of insurance coverage, allocation, and the right to refuse and control settlement. Liberty also sought damages for breach of contract, seeking the settlement amounts and processing fees incurred in resolving the underlying lawsuits. MI countersued for contrary declarations and for damages for breach of contract and bad faith.

In ruling on the parties' summary judgment motions, the district court held that Liberty retained sole discretion to settle the underlying cases. As a result, the district court held that MI lacked the authority to approve settlement decisions. The district court also denied Liberty's motion for summary judgment on the bad faith claims for two reasons. First, the district court held that MI's inability to approve of settlements would not preclude a finding that Liberty acted in bad faith in settling the claims. This was because bad faith extends to unreasonableness in paying a claim as well as the manner in which a claim is processed. Second, the district

10

court held that the settlement amounts provided sufficient evidence for MI to take its bad faith claim to a jury.

The district court held a jury trial on the breach of contract and bad faith claims. The district court granted Liberty's motion in limine to exclude any evidence that Liberty never defended or settled a case against MI, aside from those at issue, for an amount exceeding the $500,000 deductible. During MI's case-in-chief, the district court sustained Liberty's objection to MI evidence related to Liberty's motive in reaching the final settlement amounts, finding this motive evidence irrelevant and unduly prejudicial.[4]

The evidence adduced at trial tracked the aforementioned facts. MI offered evidence that Liberty failed to disclose certain portions of settlement discussions, including the timing of the Avian Forest and Marais settlements. MI's evidence also suggested that Liberty's claims expert failed to closely review the reserves. Don Langro, a Liberty claims adjuster who negotiated the settlements, admitted that he was unaware of MI's financial stake at the time of his negotiations. MI presented evidence of its intent to defend its reputation and protect itself from being an easy target for future products defect

---

[4] MI sought introduction of a de bene esse deposition of an underwriting expert as evidence of Liberty's financial self-interest.

11

lawsuits, in which other plaintiffs might sue in hopes of obtaining a settlement payout. This included testimony by Gary regarding his evaluation of the claims and settlements, and his belief that Liberty should have taken the underlying lawsuits to trial.

Conflicting testimony arose as to the processing claims files. The evidence demonstrated that Liberty opened twenty-six claims related to the underlying lawsuits. According to Langro, Liberty typically opened one claim file per lawsuit per year of coverage. Another Liberty witness noted that a single occurrence of injury or damage could give rise to multiple processing claims. Additional witnesses suggested that each of the five underlying cases were actually two lawsuits -- one involving the homeowners association and one involving the individual homeowners -- thus requiring multiple claims per suit.

After MI's case-in-chief, Liberty moved for a directed verdict. Liberty averred, inter alia, that MI failed to prove bad faith damages. Specifically, Liberty's counsel argued that MI's only evidence on damages were the settlement amounts -- which MI had not paid -- and these amounts could not undergird a bad faith action because MI failed to provide evidence of causation. The district court denied this motion and the parties' other Rule 50 motions.

12

The jury returned a verdict in favor of both parties. The jury ruled in Liberty's favor on its breach of contract claim, thereby holding MI liable for $894,416.01 -- the amount billed by Liberty to MI for the settlements. The jury also ruled in MI's favor on its breach of contract claim, awarding MI $18,290 -- the amount of excess processing fees. On MI's bad faith claim, the jury ruled in MI's favor and found Liberty liable for consequential damages of $684,416.01. The jury also awarded MI $12.5 million in bad faith punitive damages.

The parties filed numerous post-trial motions. Liberty sought judgment notwithstanding the verdict (JNOV) on the bad faith claim, a new trial based on improper jury instructions, reduction of punitive damages, and an award of prejudgment interests and costs. MI sought judgment as a matter of law (JMOL) as to a portion of Liberty's contract damages, and for attorney's fees and costs.

The district court disposed of most of the post-trial motions on August 10, 2012, leaving prejudgment interest and costs for later resolution. The district court granted Liberty's motion for JNOV on the grounds that MI failed to prove damages flowing from any bad faith. The district court held that the jury had sufficient evidence to find the settlement amounts unreasonably high, based on the reserve amounts, alleged unpreparedness of defense counsel to conduct a trial, and

13

disputes between the parties as to whether Liberty should have taken the underlying cases to trial. However, the district court held that MI failed to prove that absent bad faith, MI would have spent less than the settlement amounts on defense costs and, in the event of an adverse verdict, damages. With MI having failed to prove actual or consequential damages, the district court found that MI was not entitled to punitive damages.

The district court granted in part MI's JMOL on the basis that Liberty was not entitled to the $290,000 of the Marais settlement allocated to Zurich. Having construed MI's motion as including a request for remittitur, the court reduced Liberty's contract damages to $684,416.01. The district court denied Liberty's motion for a new trial and MI's motion for attorney's fees. Subsequent to this order, after Liberty notified the district court it would accept remittitur in lieu of a new trial on the contract claims, the district court denied Liberty's motion for prejudgment interest and costs.

The parties timely appealed the post-trial rulings, and MI also appealed the district court's evidentiary rulings. We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

The parties raise a host of issues arising from the district court's disposal of the case, virtually all of which track the parties' post-trial motions. They concern (1) bad

14

faith liability and damages, (2) breach of contract damages, (3) prejudgment interest, (4) litigation costs, and (5) jury instructions and evidentiary rulings. We discuss each of these in turn.

## II.

The central issue on appeal concerns the district court's granting in part of Liberty's motion for JNOV. In doing so, the court set aside the damages for Liberty's breach of the duty of good faith and fair dealing. We review de novo the grant or denial of a motion for judgment as a matter of law. Anderson v. Russell, 247 F.3d 125, 129 (4th Cir. 2001). We "accord the utmost respect to jury verdicts and tread gingerly in reviewing them." Price v. City of Charlotte, N.C., 93 F.3d 1241, 1250 (4th Cir. 1996). Where the district court rules contrary to the jury's findings, we reverse such a decision, thereby affirming the jury's conclusions, where "substantial evidence" supports the jury verdict. Anderson, 247 F.3d at 129; see also First Union Commercial Corp. v. GATX Cap. Corp., 411 F.3d 551, 556 (4th Cir. 2005).

The parties dispute whether Liberty waived its challenge on the damages evidence, as well as the district court's substantive rulings on liability, damages, and attorney's fees.

A.

As an initial matter, MI argues that Liberty waived its right to argue causation of bad faith damages in its motion for JNOV. MI claims that Liberty's motion for directed verdict, by failing to make the specific arguments in the motion for JNOV, waived any challenge on those grounds asserted post-trial. We disagree and find that Liberty sufficiently preserved the issue.

A trial court may entertain a motion for judgment as a matter of law any time before the case has been submitted to the jury and after a party has been fully heard on a claim or an issue. Fed. R. Civ. P. 50(a). The court may grant the motion if the evidence could not provide a legally sufficient basis for a reasonable jury to find for the nonmoving party. Fed. R. Civ. P. 50(a)(1). "The motion must specify the judgment sought and the law and facts that entitle the movant to the judgment." Fed. R. Civ. P. 50(a)(2).

Rule 50(b) permits a party to renew its Rule 50(a) motion post-trial, asserting the same grounds initially raised in the prior motion. Fed. R. Civ. P. 50(b); see also Price, 93 F.3d at 1248-49. In considering a challenge based on a lack of specificity in the Rule 50(a) motion, we remain mindful that the Federal Rules are to be construed liberally, and consider whether the motion provides the court and the nonmoving party sufficient notice of any alleged deficiencies in evidence.

16

<u>Singer v. Dungan</u>, 45 F.3d 823, 829 (4th Cir. 1995) (citations omitted).

We find that Liberty preserved its Rule 50(b) arguments. In its Rule 50(a) motion, Liberty plainly stated, albeit briefly, that the settlement amounts alone were insufficient to demonstrate what damages resulted from any alleged bad faith. Having identified a perceived deficiency in damages and causation, Liberty sufficiently preserved this issue for post-trial review.[5] See <u>Price</u>, 93 F.3d at 1249. The fact that a party expands its reasoning and offers more specificity in its post-trial motion does not run afoul of the Federal Rules, so long as the legal and factual basis for the renewed motion mirrors that presented in the Rule 50(a) motion. See <u>Wallace v. Poulos</u>, 861 F. Supp. 2d 587, 595-96 (D. Md. 2012) (Rule 50(b) motion was properly preserved where a less detailed Rule 50(a) motion set forth the same basic facts, thus providing adequate notice of perceived deficiencies). In both motions, Liberty focused on the failure to demonstrate damages actually caused by bad faith, and that MI's mere reliance on the settlement amounts

---

[5] This Court has found issues sufficiently preserved where the Rule 50(a) motion contained nonspecific explanations or was otherwise improper yet placed the court and nonmoving party on notice of the alleged defects. See <u>Singer</u>, 45 F.3d at 829; <u>Fed. Savings & Loan Ins. Corp. v. Reeves</u>, 816 F.2d 130 (4th Cir. 1987); <u>Miller v. Premier Corp.</u>, 608 F.2d 973 (4th Cir. 1979).

17

could not prove harm. Thus, Liberty did not waive its post-trial challenge to the bad faith consequential damages award.

B.

The substantive challenges to the district court's ruling on bad faith concern the legal standard applied by the court, sufficiency of evidence on actual or consequential damages, the availability of nominal and punitive damages, and an award of attorney's fees either as damages or by statutory provision.

1.

South Carolina recognizes a common law tort action for an insurer's bad faith in exercising duties owed to policyholders. Charleston Cnty. Sch. Dist. v. State Budget & Ctrl. Bd., 437 S.E.2d 6, 7-8 (S.C. 1993); Nichols v. State Farm Mut. Auto. Ins. Co., 306 S.E.2d 616, 619 (S.C. 1983). Bad faith claims subject insurers to tort liability where the insurer unreasonably refuses to settle within policy limits, Tyger River Pine Co. v. Maryland Cas. Co., 170 S.E. 346 (S.C. 1933), and where an insured demonstrates "bad faith or unreasonable action by the insurer in processing a claim," Nichols, 306 S.E.2d at 619. This tort is rooted in the implied covenant of good faith and fair dealing in every insurance contract. Id. at 618.

Where an insurer refuses to provide benefits under a mutually binding insurance contract, the insured may prevail on a bad faith action by proving "the insurer's bad faith or

18

unreasonable action in breach of an implied covenant of good faith and fair dealing arising on the contract," and damages stemming from that breach. See Crossley v. State Farm Mut. Auto. Ins. Co., 415 S.E.2d 393, 396-97 (S.C. 1992); Peterson v. W. Am. Ins. Co., 518 S.E.2d 608, 614-15 (S.C. Ct. App. 1999). "An insurer acts in bad faith where there is no reasonable basis to support the insurer's decision." Doe v. S.C. Med. Malpractice Liability Joint Underwriting Ass'n, 557 S.E.2d 670, 674 (S.C. 2001) (internal quotation marks and citations omitted). The parties dispute the presence of both a bad faith breach and resulting damages.

2.

MI contends that the district court applied an incorrect legal standard for what comprises bad faith.[6] In its JNOV order,

---

[6] Liberty alternatively proposes two bad faith liability standards, in the event we are inclined to reverse the district court's ruling on bad faith conduct. The first is that a settlement within policy limits cannot be unreasonably high. The second is that express discretionary authority to settle cannot give rise to bad faith absent an abuse of discretion. Neither proposal appears sustainable under South Carolina law. See Doe, 557 S.E.2d at 675-76 (discretion to settle is a significant factor in assessing reasonableness of a settlement decision, but not a bar to bad faith liability); Tadlock Painting Co. v. Md. Cas. Co., 473 S.E.2d 52, 54 (S.C. 1996) ("The fact that the claims were ultimately settled for an amount less than the applicable deductible . . . is irrelevant to whether the insurer performed its duties in good faith."); Tiger River Pine Co. v. Maryland Cas. Co., 161 S.E. 491, 493 (S.C. 1931) (exclusive control of and right to settle a suit does not eliminate the insurer's duty to avoid bad faith).

19

the district court determined that there was sufficient evidence introduced at trial to support the jury's finding that the settlement amounts were unreasonably high. In addition to evidence of unreasonably high settlement amounts, MI contends that the district court should have also considered evidence as to Liberty's bad faith processing of MI's claims. On these facts, we disagree.

Evidence regarding processing fees did not inform the jury's bad faith finding. The verdict form provided space to write in the damage amount for each claim. These amounts provided insight into the usually unascertainable thoughts of the jury, to the extent that we know that the jury considered the processing fees under MI's breach of contract claim. For MI's contract claim, the jury entered $18,290 -- the amount of the wrongfully charged processing fees. For bad faith damages, the jury awarded an amount equal to the total owed to Liberty for the settlements. The jury's award thus suggests that it found bad faith in the settlements, not any aspect of processing. See Dowling v. Home Buyers Warranty Corp., II, 428 S.E.2d 709, 711 (S.C. 1993) (no bad faith damages where the verdict form permitted separate entries for contract and bad faith damages and "[t]he jury returned its verdict with a slash drawn through the space where it could have awarded actual damages on the bad faith cause of action"). Had the jury found

20

bad faith in the overcharging of claims fees, it presumably would have added another $18,290 in bad faith damages.[7] Thus, the jury's verdict demonstrates that the district court properly limited its bad faith examination to the unreasonableness of the settlement amounts.

Furthermore, MI's contention that charging excessive fees supports bad faith is beyond the bounds of South Carolina law in this context. The bad faith tort rests upon the special characteristics of the insurance relationship and the concern that, in the absence of potential tort liability, an insurer could "delay and deny a claim with virtual impunity" and pay only the contractual limits. Masterclean, Inc. v. Star Ins. Co., 556 S.E.2d 371, 374-75 (S.C. 2001). Hence, bad faith processing liability has typically involved a delay in providing or refusal to provide benefits. See Tadlock Painting Co. v. Md. Cas. Co., 473 S.E.2d 52, 53 (S.C. 1996) (insurer refused to continue settlement negotiations until insured agreed to insurer's interpretation of deductible provision); Cock-N-Bull Steak House, Inc. v. Generali Ins. Co., 466 S.E.2d 727, 730 (S.C. 1996) (insurer failed to provide reasonable basis for

---

[7] Awarding the fee amounts under both bad faith and contract damages would have, in any event, resulted in an impermissible double recovery. See Braswell Shipyards, Inc. v. Beazer East, Inc., 2 F.3d 1331, 1338 (4th Cir. 1993) (citing Taylor v. Hoppin' Johns, Inc., 405 S.E.2d 410, 412 (S.C. Ct. App. 1991)).

21

excluding certain eligible items from coverage); <u>Nichols</u>, 306 S.E.2d at 339 (insurer's refusal to pay for damage incurred by auto theft loss resulted in seven-month delay in car repair); <u>see</u> <u>also</u> <u>Ocean Winds Council of Co-Owners, Inc. v. Auto-Owners Ins. Co.</u>, 241 F. Supp. 2d 572, 576-77 (D.S.C. 2002) (question of fact for jury where insurer delayed resolution by failing to deny the claim, provide reasons for denial, or respond to insured attorney's correspondence).

Liberty did not delay or deny coverage. It promptly defended and settled claims, and in the process charged a number of fees based on a disputed interpretation of the contract. Charging excessive fees might constitute bad faith when used to delay or deny coverage, or as leverage to pressure an insured into making certain concessions. Liberty engaged in no such use. The district court found the processing fees excessive only because two reasonable interpretations of policy language required a construction against Liberty, as the drafter, and favorable to MI. Judicial interpretation and contract damages adequately resolve the excessive fee dispute, rendering an extra-contractual remedy unnecessary here. The excess charges are not the sort of bad faith processing of <u>Nichols</u> and its progeny.

For these reasons, we find no error in the bad faith legal standard applied by district court.

3.

The district court set aside the jury's award of actual or consequential bad faith damages, finding that MI failed to provide sufficient evidence of ascertainable loss. The district court held that without any evidence of what MI would have spent on trial and potential liability absent any bad faith, the jury lacked a legally sufficient basis for determining the actual damages caused by Liberty's actions. MI argues that the district court erred in requiring such evidence.[8] We disagree.

A policyholder may receive actual or consequential damages in a bad faith action. Nichols, 306 S.E.2d at 619. "To recover damages, the evidence must enable the jury to determine the amount of damages with reasonable certainty or accuracy." Magnolia N. Prop. Owners Ass'n, Inc. v. Heritage Communities, Inc., 725 S.E.2d 112, 126 (S.C. Ct. App. 2012); Pope v. Heritage Communities, Inc., 717 S.E.2d 765, 781 (S.C. Ct. App. 2011). Although damages need not be proven with mathematical certainty, a close estimate of the loss is necessary, even if the damages

_____

[8] MI also contends that the district court's post-trial order contradicted its denial of summary judgment. On the contrary, finding a genuine issue of material fact for the jury did not relieve MI of the burden to prove causation. If, for example, the jury found that MI was not contractually liable for the settlement amounts, the deductible amounts could have, in theory, represented actual damages. Because the jury found MI liable for the deductible amount under the Policies, additional evidence of causation was required.

23

calculation depends upon contingent events. Magnolia North, 725 S.E.2d at 126 (citations omitted). Damages left to conjecture, guess, or speculation will not enable recovery. Piggy Park Enters., Inc. v. Schofield, 162 S.E.2d 705, 708 (S.C. 1968); see also Eastman Kodak Co. of N.Y. v. S. Photo Materials Co., 273 U.S. 359, 379 (1927) (damages must be based on evidence demonstrating an ascertainable loss amount, not guess or speculation).

To the extent it is not speculative, MI's damages evidence undermines its argument by demonstrating an absence of damages. MI relies upon the estimated trial costs, reserves, and settlement amounts for each case. Considering all five underlying claims, the total estimate to defend the cases was $769,310 and the reserves, estimating MI's exposure, totaled $475,000. The total settlement amount was $1,047,300 -- $197,010 less than the combined estimated defense costs and reserves. Using these figures, no actual damage occurred. Cf. Tyger River, 170 S.E. at 347 (actual damages shown where the adverse jury verdict awarded an amount greater that the rejected settlement). If, for example, Liberty settled all claims for $1,000,000 and defense and liability estimates totaled $500,000, then we would be considering a very different situation, wherein MI could reasonably claim $500,000 in actual or consequential damages.

24

Further, MI failed to present evidence calling these estimates, upon which they now heavily rely, into question. MI offered no evidence that the defense costs were overstated, nor did it provide substantial evidence that it would have prevailed had it proceeded to trial in the underlying cases. In addressing the jury, MI's trial counsel referred to Marais in closing argument as "catastrophically difficult." The jury also heard testimony that the developer in Avian Forest and Magnolia North suffered adverse verdicts in Avian Forest and at least one other lawsuit. One adverse verdict, subject to joint and several liability, in any of the five underlying claims could have exceeded the total settlement amounts here. Without substantial evidence supporting a finding that it would have either prevailed in the underlying lawsuits or spent less than the settlement amounts on defense and liability, MI failed to show that it suffered any damages due to Liberty's decision to settle.

MI contends that the jury was within its power to reject the defense costs and award the full settlement amounts. We find this position specious for two reasons. First, no reasonable factfinder could conclude that MI could have proceeded to trial without incurring any defense costs. MI's argument that the jury was within its power to discount the prospective trial costs defies common sense. Proceeding to

trial would have certainly cost some amount, arguably a significant figure due to the complexity of construction defect cases and the need for expert testimony on claims seeking multimillion dollar damages.

Second, to the extent MI relies on testimony that some of the plaintiffs "might" have walked away from their claims at any moment, it presented nothing more than speculative testimony on this point. No facts indicated that any of the underlying plaintiffs considered abandoning their claims. Clarke repeatedly noted that resolution would only occur through either settlement or trial. MI fails to demonstrate where in the record the evidence indicates that any of the underlying plaintiffs actually wavered on their commitment to litigate their claims. Indeed, at least two sets of plaintiffs -- those in Avian Forest and Magnolia North -- proceeded to trial against other defendants. Thus, the jury was not free to reject the possibility of incurring any defense costs.

MI also urges that we impose upon Liberty, as the insurer, the burden of proving damages in instances of bad faith refusal to settle cases. Relying on Washington law, MI argues that in the insurance context, the insurer stands in a much better position of knowing the costs of litigation and thus being able to prove what would have happened absent bad faith. Mut. of Enumclaw Ins. Co. v. Dan Paulson Constr., Inc., 196 P.3d 1, 11

26

(Wash. 2007). It further maintains that such a burden is appropriate in order to prevent Liberty from benefiting from its misconduct. See Champion v. Whaley, 311 S.E.2d 404, 406 (S.C. Ct. App. 1984) (once a plaintiff shows that defendant's actions "substantially contributed" to the nonoccurrence of a contractual condition, burden shifts to defendant to show that condition would not have occurred regardless of prevention).

We decline to adopt MI's burden shifting argument. MI's reliance on Champion is "seriously misplaced," as the "doctrine of prevention has yet to be applied as a substitute for proof of damages" in the insurance context. Royal Ins. Co. of Am. v. Reliance Ins. Co., 140 F. Supp. 2d 609, 621 (D.S.C. 2001). Without guidance from South Carolina courts, we decline to make such extension here. Similarly, we decline to follow Washington state law, notwithstanding that court's thorough consideration of the issue, without guidance from the South Carolina courts.

For these reasons, we affirm the district court's ruling that MI failed to prove direct or indirect damages.

4.

We reverse the district court's ruling that absent actual or consequential damages, MI cannot receive punitive damages. An absence of ascertainable damages does not necessarily preclude nominal or punitive damages where, as here, the jury finds a party liable for punitive damages.

27

A court may award punitive damages in bad faith tort actions for conduct willful, wanton, or reckless in disregarding a plaintiff's rights.  Nichols, 306 S.E.2d at 619.  Generally, punitive damages are only awarded where a court also awards actual or nominal damages.  McGee v. Bruce Hosp. Sys., 545 S.E.2d 286, 288 (S.C. 2001) (citing Cook v. Atl. Coast Line. R.R. Co., 190 S.E. 923 (S.C. 1937)).  Nominal damages need not be specifically pleaded where a party alleges a claim for general damages; the general damage allegation sufficiently encompasses nominal damages.  Ins. Servs. of Beaufort, Inc. v. Aetna Cas. & Sur. Co., 966 F.2d 847, 853 (4th Cir. 1992). Furthermore, where pleadings allege and evidence proves a willful invasion or infringement of a right, courts presume nominal damages, even if exact measurement of actual damages is not possible.  Cook, 190 S.E. at 924.

The rule requiring actual or nominal damages as a prerequisite to punitive damages "is premised on the fact that liability must be established before a plaintiff can seek punitive damages."  McGee, 545 S.E.2d at 288.  Thus, a plaintiff is entitled to a jury determination on punitive damages liability even in the absence of ascertainable loss.  Id. at 288-89; cf. Aetna, 966 F.2d at 853 ("The recovery of nominal damages is particularly appropriate to vindicate the violation of a right . . . where injury is shown but damages cannot be

28

proven."). Where a jury finds a willful or reckless invasion of a legal right, a court presumes that nominal actual damages are merged into a punitive damage award. Hinson v. A. T. Sistare Constr. Co., 113 S.E.2d 341, 345 (S.C. 1960) (citing Cook, 190 S.E. at 924).

Despite its inability to demonstrate direct or indirect damages, MI was entitled to, and did receive, the opportunity to have the jury consider punitive damages liability. The court properly instructed the jury as to the punitive damages standard. In awarding punitive damages, the jury found Liberty's actions willful, wanton, or reckless. As a result, MI is not prohibited from receiving punitive damages. See McGee, 545 S.E.2d at 288-89.

The district court's sole basis for setting aside the jury's punitive damages award was MI's failure to prove ascertainable damages of Liberty's bad faith. Having already applied the preponderance of evidence standard to find bad faith, the district court should have further considered whether MI "might be entitled to nominal damages . . . even [though] actual damages cannot be precisely ascertained." Aetna, 966 F.2d at 853. The district court's opinion does not speak to whether it found that the evidence supported the jury's finding that Liberty acted willfully, wantonly, or recklessly. If the court finds the evidence sufficient, then nominal damages may be

29

presumed, Cook, 190 S.E. at 924, and the court must consider whether punitive damages are appropriate and whether the jury's award was excessive.

Accordingly, we vacate the district court's ruling on punitive damages. On remand, the district court must consider whether the evidence supported the jury's finding that Liberty engaged in willful, wanton, or reckless conduct. If so, MI is entitled to nominal damages, and then the court must consider Liberty's challenge to the amount of the punitive damages award.

C.

MI argues that it was entitled to attorney's fees either as consequential damages or pursuant to S.C. Code § 38-59-40. Neither argument carries the day.

1.

MI first claims attorney's fees as consequential damages in bad faith claims. This theory relies on MI's assumption that South Carolina follows California on issues concerning bad faith insurer actions. Because California recognizes attorney's fees as damages in bad faith claims to a certain extent, see Brandt v. Super. Ct. of San Diego Cnty., 693 P.2d 796 (Cal. 1985), MI contends South Carolina implicitly recognizes attorney's fees as consequential damages.

Courts applying South Carolina bad faith law have not awarded attorney's fees as consequential damages in tort

30

actions.  MI acknowledges that in <u>Andrews v. Central Surety Insurance Company</u>, 271 F. Supp. 814 (D.S.C. 1967), the court held that a plaintiff could not recover attorney's fees incurred in prosecuting a bad faith insurance claim.  <u>Id.</u> at 821.  No other South Carolina court speaks directly to this issue.

For additional reasons, we do not find that California's rule on attorney's fees applies here.  MI's inference that South Carolina strictly follows California law on bad faith insurance issues is dubious.  South Carolina does not look explicitly to California law in the bad faith context, and will consider California's principles equally with those of other states.  <u>See, e.g.</u>, <u>Boldt Co. v. Thomason Elec. & Am. Contractors Indem. Co.</u>, 820 F. Supp. 2d 703, 705 (D.S.C. 2007).  <u>Nichols</u>, which preceded <u>Brandt</u>, only recognized that the general principle supporting the bad faith processing tort was first noted in a 1973 California case and later in other jurisdictions.  306 S.E.2d at 618.  MI does not cite any published South Carolina decision explicitly stating that South Carolina has faithfully adhered to California law in this context.  Until the South Carolina courts advance MI's position, we decline to do so.

Thus, attorney's fees are unavailable to MI as consequential damages.[9]

2.

Alternatively, MI seeks attorney's fees pursuant to S.C. Code § 38-59-40.  This statute provides for an attorney's fees award where an insurer refuses to defend or pay a claim without reasonable cause.  Mixson, Inc. v. Am. Loyalty Ins. Co., 562 S.E.2d 659, 663 (S.C. Ct. App. 2002); see also Boggs v. Aetna Cas. & Sur. Co., 252 S.E.2d 565, 568 (S.C. 1979) (applying a predecessor of the current statute).  MI advances the novel argument that Liberty's disregard of MI's intentions effectively amounts to a refusal to defend.

MI's construction crumbles upon the slightest of examinations.  The South Carolina statute "did not intend . . . that attorneys' fees should be paid in every contested case won by the insured."  Boggs, 252 S.E.2d at 465.  Its title, "Liability for attorneys' fees where insurer has refused to pay claim," proves as much.  We refrain from reading the statute as applicable to anything beyond a refusal to defend, a situation

---

[9] MI also notes, albeit briefly, that South Carolina recognizes an exception to the unavailability of attorney's fees where indemnification is at issue.  See Addy v. Bolton, 183 S.E.2d 708 (S.C. 1971).  However, one element of this exception is that the defendant's tortious conduct give rise to the plaintiff's dispute with a third party, id. at 709-10, which is not the case here.

that did not arise on these facts. The evidence at trial runs counter to the argument that Liberty refused to defend MI. A bad faith settlement is still a settlement, and in this case, was a timely one. Liberty's settlements do not equate to a failure to defend or refusal to pay that leaves a policyholder to fend for itself in the underlying dispute. The district court did not err in denying MI's request for attorney's fees under S.C. Code § 38-59-40.

III.

MI also appeals the district court's order denying MI's challenge to Liberty's breach of contract damages. MI argues that the district court should not have allowed Liberty to recover damages for liabilities incurred in bad faith. Essentially, MI contends, the breach of the covenant of good faith was unlawful and thus placed the settlements, and MI's obligation to pay the deductible amounts, beyond the bounds of its contractual duties. See Wachovia Bank, N.A. v. Coffey, 698 S.E.2d 244 (S.C. Ct. App. 2010) (lender's unauthorized practice of law precludes recovery for the consequences of that act); Jackson v. Bi-Lo Stores, Inc., 437 S.E.2d 168 (S.C. Ct. App. 1993) (no contract damages where bribery activities rendered contract illegal).

33

To the extent it rests on pillars of the illegality doctrine, MI's argument fails. See Bi-Lo, 437 S.E.2d at 170 (courts will not aid plaintiffs guilty of illegal act); see also McMullen v. Hoffman, 174 U.S. 639 (1899) ("[N]o court will lend its assistance in any way towards carrying out the terms of an illegal contract . . . nor will [courts] enforce any alleged rights directly springing from such a contract."). The illegality doctrine, prominent in Coffey and Bi-Lo, does not preclude recovery under valid agreements. See Graham v. Graham, 278 S.E.2d 345, 347 (S.C. 1981) ("[T]he ground of illegality . . . was unavailable to the valid, separate agreement allegedly breached."). The validity of the Policies is undisputed. MI's attempt to analogize Liberty's settlements to criminal activity or unenforceable agreements is simply overreaching.

The Policies obligated MI to reimburse Liberty up to $500,000 in indemnity and defense costs per occurrence. Each settlement fell within this limit. MI attempts to circumvent this obligation by saying that they are only "contractually bound to reimburse Liberty for payments that were properly incurred under the policies," and should not reimburse Liberty for expenditures MI did not wish to incur. However, Liberty retained the right to settle cases at its discretion. Promptly defending, investigating, and settling the underlying suits was the very purpose of the Policies. Liberty's settlement

34

decisions were at odds with MI's assessments of the cases, not any contractual duties or obligations. MI remained obligated to reimburse Liberty up to $500,000 spent per occurrence defending MI. Accordingly, we affirm the district court's order awarding $684,416.01 in contract damages to Liberty.

IV.

Liberty appeals the district court's orders denying prejudgment interests and costs. We affirm.

A.

Liberty argues that it is entitled to prejudgment interest under the terms of the Policies. State law governs prejudgment interest awards in diversity cases. Hitachi Credit Am. Corp. v. Signet Bank, 166 F.3d 614, 632-33 (4th Cir. 1999). Prejudgment interest awards lie within the discretion of the trial court. Jacobs v. Am. Mut. Fire Ins. Co. of Charleston, 340 S.E.2d 142, 143 (S.C. 1986). The district court held that the interest amount due was incapable of being readily ascertained at the time Liberty's contract claim arose.

"In all cases of accounts stated and in all cases wherein any sum or sums of money shall be ascertained and, being due, shall draw interest according to law, the legal interest shall be at the rate of eight and three-fourths percent per annum." S.C. Code Ann. § 34-31-20(A). South Carolina permits

35

prejudgment interest "on obligations to pay money from the time when, either by agreement of the parties or operation of law, the payment is demandable, if the sum due is certain or capable of being reduced to certainty." APAC Carolina, Inc. v. Town of Allendale, S.C., 41 F.3d 157, 165 (4th Cir. 1994) (quoting Babb v. Rothrock, 426 S.E.2d 789, 791 (S.C. 1993)); see also GTR Rental, LLC v. DalCanton, 547 F. Supp. 2d 510, 524 (D.S.C. 2008). In determining whether the sum may be ascertained, courts consider "whether the measure of recovery, not necessarily the amount of damages, is fixed by conditions existing at the time the claim arose." Butler Contracting, Inc. v. Court Street, LLC, 631 S.E.2d 252, 259 (S.C. 2006). A claim will not be considered unliquidated for purposes of prejudgment interest solely due to a dispute as to the sum due. Babb, 426 S.E.2d at 791. A damages dispute hinging on uncertainty of contractual terms renders the sum due unascertainable. Vaughn Dev., Inc. v. Westvaco Dev. Corp., 642 S.E.2d 757, 759-60 (S.C. Ct. App. 2007).

The district court could not determine the sum due Liberty until it resolved a contractual dispute regarding the parties' rights. This contractual uncertainty could be enough to preclude a prejudgment interest award. Westvaco, 642 S.E.2d at 759-60. In addition, we do not find that the measure of recovery was fixed at the time Liberty's claim arose. Liberty

36

identified two different owed sums in its First Amended Complaint. Liberty does not explain any mathematical equation for ascertaining its damages or how a fixed measure of recovery caused it to reference two different damages amounts in the same paragraph. Thus, we find that Liberty's damages were not fixed at the time the claim arose.

B.

Liberty argues that the district court erred in denying its request for costs. We review a denial of costs for abuse of discretion. Teague v. Bakker, 35 F.3d 978, 996 (4th Cir. 1994). A prevailing party is presumptively entitled to receive costs. Id. at 995-96; see also Fed. R. Civ. P. 54(d)(1). Departure from this presumption requires "some good reason for doing so." Teague, 35 F.3d at 996.

The district court did not abuse its discretion. The district court cited the closeness of the issues, which required sifting through novel and difficult questions, including one certified to the Supreme Court of South Carolina. The district court further noted that in addition to complexity, the fact that both parties were prevailing parties as a result of the other's breach of duties suggested hesitancy in shifting costs onto either party. This conclusion is well within the discretion of the court.

37

V.

The parties further appeal evidentiary and jury instruction issues. In light of our aforementioned conclusions, these issues are moot.

VI.

We affirm the district court's ruling in all respects except for bad faith damages. We agree that without proof of expenditures absent bad faith, MI failed to demonstrate direct or indirect damages resulting from Liberty's bad faith conduct. However, we vacate the ruling on punitive damages and remand with instructions to determine whether MI is entitled to nominal and punitive damages under South Carolina law. If the court finds that the evidence supports the jury's conclusion that Liberty acted willfully, wantonly, or recklessly, MI is entitled to nominal damages, and the court must consider Liberty's challenge to the amount of punitive damages. For these reasons, the judgment of the district court is

AFFIRMED IN PART,
VACATED IN PART,
AND REMANDED.

38

DAVIS, Circuit Judge, concurring:

I concur fully in the majority opinion, but not without a measure of discomfort regarding our remand of the case to permit the district court to examine the record and determine the propriety of a punitive damages award.

To be sure, it appears that South Carolina has something of a unique jurisprudence surrounding the availability of punitive damages. See, e.g., Gamble v. Stevenson, 406 S.E.2d 350 (S.C. 1991)(punitive damages allowed against a utility company for personal injuries resulting from a motor vehicle collision in an intersection where employees of the utility negligently took down a stop sign during maintenance work in the street). One is moved to observe that South Carolina seems to have an endearing affinity for making available punitive damages in routine tort claims. Id.

In this case, the majority reasons as follows, in part:

> Punitive damages are available only where a court also awards actual or nominal damages. Nominal damages are presumed where pleadings allege and evidence proves a willful invasion or infringement of a right, even if an exact measurement of actual damages is not possible.
> The rule requiring actual or nominal damages as a predicate for punitive damages "is premised on the fact that liability must be established before a plaintiff can seek punitive damages." Thus, a plaintiff is entitled to a jury determination on punitive damages liability even in the absence of ascertainable loss. [Ins. Servs. of Beaufort, Inc. v. Aetna Cas. & Sur. Co., 966 F.2d 847, 853 (4th Cir. 1992)] ("The recovery of nominal damages is

39

> particularly appropriate to vindicate the violation of a right . . . where injury is shown but damages cannot be proven."). Where a jury finds a willful or reckless invasion of a legal right, a court presumes that nominal actual damages are merged into a punitive damage award.

Ante, at 28-29 (citations and footnote omitted). I am dubitante. This case is truly sui generis: bad faith counts against an insurer based on property damage claims settled for less than policy limits, with little showing that if the insured had had its way and taken the cases to trial, it would have been out-of-pocket by a lesser amount than it was required to pay to settle the claims within its bargained-for deductible.

In short, I lack any certainty that the Supreme Court of South Carolina would reach the result we reach on the record before us. That is, I question whether the kind of pecuniary "injury" Liberty has ostensibly inflicted in this case, an injury for which there is no proof of actual damage or loss, supports a claim for nominal damages sufficient to serve as a predicate for an award of punitive damages. Nevertheless, I believe the majority opinion's valiant effort to harmonize South Carolina's "bad faith" case law and its damages principles is as well thought out as the law of the state allows.[*] I further

---

[*] Compare Daniels v. Coleman, 253 S.E.2d 593, 597-98 (S.C. 1969)("In contradistinction with trespass and other direct injuries for which the complainant is awarded nominal damages if he should fail to plead and prove actual damage, deceit belongs (Continued)

40

understand that the district court is authorized to exercise its good judgment in its exploration of this issue upon the remand. We should not be surprised if the district court concludes, at the end of the day, that this is a bridge too far.

All that said, I concur fully in the majority opinion.

---

to that class of tort of which pecuniary loss generally constitutes part of the cause of action.") with Gignilliat v. Gignilliat, Savitz & Bettis, L.L.P., 684 S.E.2d 756, 762 n.4 (S.C. 2009)(finding a presumption of nominal damages as it would be "illogical to conclude that a tort can exist without any potential for compensation under any circumstances").