**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 19-1600**

SABEIN BURGESS,

Plaintiff - Appellee,

v.

GERALD ALAN GOLDSTEIN,

Defendant - Appellant,

and

BALTIMORE POLICE DEPARTMENT; DETECTIVE WILLIAM RITZ; DANIEL VAN GELDER; OFFICER DALE WEESE; OFFICER RICHARD PURTELL; DETECTIVE/SGT. STEVEN LEHMAN; DETECTIVE ROBERT PATTON; DETECTIVE NEVERDON; UNKNOWN EMPLOYEES OF THE BALTIMORE POLICE DEPARTMENT; MAYOR AND CITY COUNCIL OF BALTIMORE; KELLY MILES, Officer; JOHN BOYD, Officer; JOHN SKINNER, Officer; DEAN PALMERE, Officer; DETECTIVE GERALD ALAN GOLDSTEIN

Defendants.

**No. 19-1602**

SABEIN BURGESS,

Plaintiff – Appellant,

v.

GERALD ALAN GOLDSTEIN, Detective; BALTIMORE POLICE DEPARTMENT; STEVEN LEHMAN, Detective/Sgt.; MAYOR AND CITY COUNCIL OF BALTIMORE; WILLIAM RITZ, Detective; DANIEL VAN GELDER,

Defendants – Appellees,

and

DALE WEESE, Officer; ROBERT PATTON, Detective; UNKNOWN EMPLOYEES OF THE BALTIMORE POLICE DEPARTMENT; KELLY MILES, Officer; JOHN BOYD, Officer; JOHN SKINNER, Officer; DEAN PALMERE, Officer; RICHARD PURTELL, Officer; NEVERDON, Detective,

Defendants.

―――――――――――

Appeals from the United States District Court for the District of Maryland, at Baltimore. Richard D. Bennett, District Judge. (1:15-cv-00834-RDB)

―――――――――――

Argued: December 11, 2020                              Decided: May 14, 2021

―――――――――――

Before FLOYD, THACKER, and QUATTLEBAUM, Circuit Judges.

―――――――――――

Affirmed in part and reversed in part and remanded by published opinion. Judge Quattlebaum wrote the opinion in which Judge Floyd and Judge Thacker joined.

―――――――――――

**ARGUED:** Michael Patrick Redmond, BALTIMORE CITY LAW DEPARTMENT, Baltimore, Maryland, for Appellant/Cross-Appellee. Jon Loevy, LOEVY & LOEVY, Chicago, Illinois, for Appellee/Cross-Appellant. **ON BRIEF:** Andre M. Davis, Rachel A. Simmonsen, BALTIMORE CITY LAW DEPARTMENT, Baltimore, Maryland, for Appellant/Cross-Appellee. Gayle Horn, Steven Art, Theresa Kleinhaus, LOEVY & LOEVY, Chicago, Illinois, for Appellee/Cross-Appellant.

―――――――――――

QUATTLEBAUM, Circuit Judge:

The facts underlying this appeal are dramatic and emotional. They involve unsavory characters from the Baltimore drug underworld, a brutal murder, a wrongful conviction and a $15 million judgment against a Baltimore Police Department officer for withholding and fabricating evidence. But the questions presented to us are not materially different from those we face in much more mundane cases. Was there sufficient evidence to support the jury's verdict? Did the district court err in failing to give a requested jury instruction? And did the district court allow inadmissible hearsay evidence?

Our answers to those questions are determined largely based on the standard of review we must employ. Because there was evidence from which a reasonable jury could have found police misconduct, we affirm the district court's denial of motions for judgment as a matter of law or a new trial under Rules 50 and 59 of the Federal Rules of Civil Procedure. Because the district court's jury instructions, taken as a whole, complied with the law and the court's earlier rulings, we find no error in them. And, although the district court improperly admitted hearsay evidence, the error, in the context of the record as a whole, was harmless. For those reasons, as more fully explained below, we affirm the jury's verdict and the district court's denial of the Rule 50 and Rule 59 motions. But we do reverse the district court's dismissal of Burgess' claim against the Baltimore Police Department under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), as described below.

## I.

Michelle Dyson was murdered late in the evening of October 5, 1994, at her home in Baltimore. Sabein Burgess, Dyson's boyfriend, was with Dyson at the home earlier that evening but left to facilitate a drug deal. Before he left, he saw Dyson put her children to bed. When he returned, he found the door of the home cracked, the front room ransacked and Dyson shot in the basement. According to Burgess, he exited the home to seek help from the police he had seen nearby, and, once he determined the police were no longer in the area, he asked a neighbor to call 911. Burgess then returned to the basement to attend to Dyson.

Around 10:27 p.m., the Baltimore Police Department ("BPD") received a call about a shooting at Dyson's house. When dispatched officers arrived on the scene, they found Burgess with Dyson's body in the basement. Burgess was handcuffed and swabbed for gunshot residue. The defendant, Gerald Goldstein, arrived on the scene around 10:45 p.m., where three or four uniformed officers were already present, and continued the investigation of the crime scene as the lead detective.

The facts surrounding Dyson's four young children at the home are heavily disputed. Reports from BPD and the Department of Social Services ("DSS") from the night of the murder indicate that the children were upstairs sleeping at the time of the incident. Further, of the thirteen officers dispatched to the crime scene, each of the eight known officers who testified, or whose testimony was stipulated, denied speaking to Dyson's

4

children on the night of the homicide.[1] But many years later, two of Dyson's four children said one or more uniformed BPD officers took them to the living room so they could get dressed and then questioned them. A BPD officer took the children from the home to DSS, then to the hospital where relatives took over care. But there is conflicting evidence as to the exact time the children left the house. Certain records indicate the children were removed from the house at 10:30 p.m. However, based on other records, the officer who transported the children testified that the children left the scene at 11:23 p.m.

BPD officers interviewed Burgess the night of the murder at the home. Later, they took him from the crime scene to the Homicide Unit at the police station for questioning by Goldstein and another detective. Burgess' statement to the detectives contained inconsistencies about what he was doing before the murder. Nevertheless, he was released that night.

As the investigation continued, the victim's father, Ron Dyson, spoke to Goldstein's supervisor, Detective Sergeant Steven Lehmann. Lehmann recorded handwritten notes from the call indicating that Mr. Dyson had been trying to reach Goldstein. His note, which was referred to as "the Lehmann Note," included the following notation: "Child Bryan? Witnes[s] 'get down basement.'" J.A. 2517. Importantly, one of Dyson's children was named Brian Rainey. Brian's subsequent testimony in the civil trial about what he saw the night his mother was murdered is critical to the issues before us.

---

[1] BPD's computer-assisted dispatch report reflects five unknown officers dispatched to the crime scene.

The Lehmann Note contained another notation: "[t]hinks a guy named 'Little Man.' Mother-in-Law got a call from jail saying 'Little Man['] did it." J.A. 2517. As described in more detail below, whether Little Man was known by the police to be an alternative suspect is also important to the claims before us.

Goldstein's homicide report included reports from other officers on the scene, names of witnesses and details about the ongoing investigation. One of those reports noted that the "victim's four children who were asleep on the second floor were turned over to the Department of Social Services." J.A. 2459. This report is central to Burgess' claim that Goldstein fabricated evidence.

About one month after the murder, the BPD Trace Analysis Unit provided Goldstein with the Gunshot Primer Residue Report indicating that, based on samples taken from the backs of the thumbs and forefingers, gunshot primer residue was found on Burgess' left and right hand. The report acknowledged that "[t]here is a possibility that these residues were transferred from the surface of a firearm or from an object which lay immediately adjacent to a firearm during its discharge." J.A. 2516. But it also explained that "[m]ost probably, however, the subject's hands were immediately adjacent to a discharging firearm or were themselves used to fire the firearm within a few hours of (time) 11:05 P.M. . . ." J.A. 2516.

A few days later, based on the conflicting statements Burgess gave about where he went after he left Dyson's house and the gunshot residue found on both hands, Goldstein applied for and received a statement of charges leading to Burgess' arrest for Dyson's murder. The day of his arrest, Burgess gave an additional interview. During the interview,

6

Goldstein asked Burgess about whether he knew someone named "Little Man." Burgess responded that "Little Man" was someone he knew but that he did not sell drugs for him nor did he know his real name.

The State of Maryland grand jury charged Burgess with first degree murder, as well as handgun charges. Burgess maintained his innocence, leading to a two-day trial in June 1995, where he was represented by defense attorney Gordon Tayback. The state presented several witnesses including Goldstein, the gunshot residue technician and Dyson's neighbor whom Burgess summoned to call the police. Burgess did not testify at the trial or present any witnesses. (J.A. 2402.) The jury found Burgess guilty of murdering Dyson and all charges, and the trial court later sentenced him to life plus 20 years in prison.

Three years later, a man named Charles Dorsey, then serving a 45-year sentence for attempted murder and armed robbery, confessed to killing Dyson. In 2013, Burgess filed a Petition for Writ of Actual Innocence in the Circuit Court for Baltimore City, Maryland, relying on several pieces of newly discovered evidence, including Dorsey's confession, concerns with the gunshot residue evidence and its interpretation and Brian—the victim's child—coming forward as a witness. Notably, Brian claimed that he was awakened the night of the murder, saw a man force his mother into their basement and that the man was not Burgess. The state did not oppose the Petition and the Circuit Court vacated the conviction and granted a new trial. The state entered a *nolle prosequi* rather than conduct a second trial. As a result, Burgess was released from prison.

## II.

In 2015, Burgess sued the City of Baltimore, the BPD and a host of elected and non-elected individuals, alleging violations of his federal and state civil rights which led to his wrongful imprisonment for Dyson's murder. Eventually, the defendants were pared down. The claims against the City and its officials were dismissed. The claims against the BPD were also dismissed except for a 42 U.S.C. § 1983 claim under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), which alleged that the BPD was liable for the conduct of its officers because that conduct was carried out pursuant to BPD policies and procedures. Later, the district court bifurcated that claim from the claims against the individual BPD officers and stayed discovery until the conclusion of the trial against the officers.

The claims against the officers proceeded, but they were also pared down. By the time the case went to the jury, the only remaining defendant was Goldstein. And the claims against him were also narrowed. The claims submitted to the jury were that Goldstein: (1) violated Burgess' constitutional rights to a fair trial by concealing exculpatory evidence, including that Brian saw a man other than Burgess enter the home and information from the FBI about alternative suspects in violation of *Brady v. Maryland*, 373 U.S. 83 (1963); (2) violated Burgess' constitutional rights by fabricating a police report that stated that all of the children were asleep at the time of the murder; (3) maliciously caused Burgess' prosecution without probable cause; and (4) intentionally inflicted emotional distress on Burgess. The first two claims were brought under the due process clauses of the federal and state constitutions and the third and fourth claims were brought under Maryland state

8

law. But all claims centered around allegations that Goldstein withheld and fabricated evidence.

After discovery, Goldstein moved for summary judgment.[2] The district court denied the motion for the most part. But it granted the motion as to Burgess' claim that Goldstein violated his due process rights by withholding exculpatory evidence about an alternative suspect named Howard Rice. In so ruling, the court held that there was no genuine dispute that Burgess and his attorney were aware of potentially exculpatory information related to Howard Rice.

Before trial, Goldstein moved to exclude documents obtained through a subpoena to the FBI as inadmissible hearsay. These documents, which referenced "ITAR-Drug-Related Murders" but which we refer to as the FBI Notes, were heavily redacted and did not identify who wrote them. But they referred to the Dyson murder, suggesting that it was drug-related, that there were other witnesses or potential suspects and, importantly, that the information had been passed on to the case detective of the BPD-Homicide Unit. As noted above, the BPD case detective assigned to the Dyson murder was Goldstein, though he was not identified by name in the FBI Notes and the name of the detective was redacted. The district court denied Goldstein's motion to exclude the FBI Notes, determining that most of the information in them was offered to show notice rather than for the truth of the matter

---

[2] For the sake of completeness, other defendants who at that point were still in the case joined in this motion and the motion to exclude the FBI Notes, which is discussed below.

asserted and admitting the portions of the document that were offered for the truth of the matter asserted under Federal Rule of Evidence 807, the residual hearsay exception.

After a ten-day trial, the jury returned a $15 million verdict in favor of Burgess. Goldstein then moved for a new trial and/or to alter or amend judgment under Rule 59. He also moved under Rule 50 for a judgment in his favor as to the four claims presented to the jury. The district court denied the motions.

Goldstein appealed, raising the following four issues: first, whether the district court erred in denying Goldstein's Rule 50 motion seeking judgment notwithstanding the verdict; second, whether the district court erred in denying Goldstein's Rule 59 motion for a new trial in view of the evidence presented at trial; third, whether the district court erred in declining to give Goldstein's proposed jury instruction that information about Howard Rice should not be considered as part of the withholding claim; and fourth, whether the district court erred in admitting a portion of the FBI Notes under Federal Rule of Evidence 807's residual hearsay exception.

We dismissed Goldstein's initial appeal for lack of jurisdiction and remanded to the district court for resolution of the *Monell* claim. *Burgess v. Goldstein*, 763 F. App'x 301, 302 (4th Cir. 2019). The district court then dismissed the *Monell* claim with prejudice and directed the clerk to close the case. The district court held that Burgess could not obtain additional relief from the *Monell* claim because he had been awarded compensatory damages and did not seek equitable relief. (J.A. 2295.) It further concluded that no such equitable relief would be appropriate given that the constitutional deprivations at the heart

10

of this matter occurred over twenty-five years ago and the evidence presented at trial did not support submission of the claim to the jury.

In addition to Goldstein's current appeal, Burgess appeals the district court's dismissal of his *Monell* claim. We have jurisdiction pursuant to 28 U.S.C. § 1291.

III.

We first consider Goldstein's argument that the district court erred in denying his Rule 50 motion. Our standard of review is important. We review the denial of a Rule 50(b) motion de novo. S*ee First Union Commercial Corp. v. GATX Capital Corp.*, 411 F.3d 551, 556 (4th Cir. 2005). But we do so with deference towards the jury's findings. "If, viewing the facts in the light most favorable to the non-moving party, there is sufficient evidence for a reasonable jury to have found in [the non-moving party's] favor, we are constrained to affirm the jury verdict." *Id.* (internal quotation marks and citation omitted). "On such appellate review we determine if a reasonable jury could have found the verdict. We do not weigh evidence nor judge the credibility of witnesses." *Id.* With this standard in mind, we begin with the *Brady* claim based on withholding of evidence before turning to the fabrication claim.

A.

Burgess alleges that Goldstein withheld information regarding Brian Rainey as a witness and the Lehmann Note.[3] In *Brady*, the Supreme Court held that the prosecution's suppression of evidence that is favorable to an accused "violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. Following *Brady*, in *Barbee v. Warden, Maryland Penitentiary*, 331 F.2d 842 (4th Cir. 1964), we held that a police officer's failure to disclose exculpatory evidence violates the Constitution as well. *See also Owens v. Baltimore City State's Attorneys Office*, 767 F.3d 379, 396 (4th Cir. 2014). However, police officers and prosecutors have different obligations from one another with respect to the disclosure of exculpatory evidence in this circuit. *Id.* at 396 n.6. In order to make out a claim that an officer violated one's constitutional rights by suppressing exculpatory evidence, Burgess must prove that (1) the evidence at issue was favorable to him; (2) the officers suppressed the evidence in bad faith; and (3) prejudice ensued. *Id.* at 396–97. But we have also held that exculpatory information is not "suppressed" when a criminal defendant is already aware of it. *Barnes v. Thompson*, 58 F.3d 971, 975–77 (4th Cir. 1995).

Goldstein claims that Burgess failed to introduce evidence from which a reasonable jury could conclude that Goldstein withheld exculpatory evidence from the prosecutor in

---

[3] Burgess also argues that the FBI Notes provide evidence that Goldstein withheld evidence of his communications with the FBI about Dyson's murder. Goldstein argued in his Rule 50 motion below and to us on appeal that the FBI Notes do not provide evidence from which a jury could reasonably conclude Goldstein withheld evidence. However, as set forth below, we conclude the district court erred in admitting the FBI Notes. Therefore, we do not consider them for purposes of our Rule 50 or Rule 59 analysis.

12

Burgess' murder trial. He further claims that Burgess failed to produce evidence from which a reasonable jury could find that both Burgess and his attorney were unaware of the non-disclosed evidence.

To begin, Goldstein's homicide file, the prosecutorial file and Burgess' attorney's file were not available in original form. Thus, the jury did not have the evidence of exactly what Goldstein had and what was turned over. With that handicap, Burgess relied on circumstantial evidence. Our question is whether he produced sufficient evidence for a jury to conclude that Goldstein withheld information about Brian and the Lehmann Note.

## 1.

Goldstein first argues there was not sufficient evidence from which the jury could have concluded that he withheld information about Brian being a witness. Goldstein maintains that the record does not contain evidence that he knew Brian or any of the other children were awake during the intrusion. For example, contemporaneous reports, such as the ones from DSS and the BPD, indicate the children were asleep upstairs in the home and that their mother was shot in the basement. Goldstein testified that Joyce Rogers, Dyson's mother and the children's grandmother, "reinforced the fact that the children were asleep during this incident." J.A. 1057. She also added that no one was going to talk to the children about the matter. Ron Dyson—the victim's father—also recalled being told the children were asleep and testified that he may have told the police that he understood Brian was asleep. He testified that he did not come to find out that Brian was awake at the time of the murder until "recent years." J.A. 1279. Burgess also testified that the children were in the

13

bed asleep. And for his part, Goldstein said that he remembered being told the children were asleep.

Goldstein acknowledges Brian's testimony, as well as that of his sister, Tawanda Dyson. Brian testified that he was awake and saw someone who was not Burgess "busting in the house," which caused him to run back to his room in fear. J.A. 1495. He also testified that the police woke the children up and took them downstairs to question them. Brian was unable to remember the exact questioning but testified that he told the police that his mom's boyfriend—Burgess—was not involved. Tawanda testified that her brother Brian told the police that he saw someone in the house who was not Burgess.

But Goldstein insists that, based on the rest of their testimony, this evidence is insufficient. Specifically, Brian and Tawanda testified that the officers in the house were uniformed. Yet it is undisputed that Goldstein was a plain-clothes detective and was not wearing a uniform on the night in question. Thus, Goldstein argues, even accepting Brian and Tawanda's testimony as true, Brian could not have talked with Goldstein, meaning there is no evidence he had information about Brian being a potential witness.

Burgess, however, offers an alternative argument. He points to testimony from Goldstein and other BPD officers that if another officer interviewed the children, they would have reported the information to Goldstein as lead detective. Goldstein admitted that he would have seen the children if they were present and awake when he was on the scene due to the layout of the house and the nature of the investigation. The other officers testified that if the children were interviewed, Goldstein would have been involved in doing so. And Goldstein's testimony that the children were gone before his arrival—meaning he could

14

not have interviewed them—was undermined by other evidence. Goldstein based his testimony not on his memory, but on a report that the children were removed from the home at 10:30 p.m. The officer who authored the report, however, clarified at trial that the correct time was approximately 11:23 p.m. instead, as verified by other police documentation. Thus, for at least 43 minutes, Goldstein and the children were in the house together. According to Burgess, this means a jury could have concluded that Goldstein saw the children and spoke to one or all of them there. While Goldstein acknowledges this evidence, he counters that it is also insufficient because none of the officers who testified said they interviewed the children.

Goldstein also maintains that in addition to being based on speculation, Burgess' position hinges on testimony that, according to him, is plainly not credible. Brian waited until 2012, 18 years after his mother's murder, to tell anyone about what he later claimed he witnessed and, when he finally revealed this information, he did not say anything about telling the police what he saw. Only in 2015 did Brian disclose that he told the police what he saw on the night of his mother's murder. Goldstein also notes that Brian has given prior inconsistent versions of his story about the night of the murder, has been previously convicted of making a false statement to a law enforcement officer, maintains a father-son relationship with Burgess and has been romantically involved with Burgess' niece. Appellant's Br. at 7-8.

Based on all of this, Goldstein maintains that any inference that he learned of Brian being awake and a potential exculpatory witness is too speculative for a jury to reasonably rely on. He insists the jury would have to believe that Goldstein interviewed the children,

15

even though Brian and Tawanda said the officer with whom they spoke was uniformed and he was not. Or the jury would have to believe that the children were interviewed by one of the BPD officers on the scene who did not testify and that they, pursuant to policy, reported that information to Goldstein even though Goldstein denies that occurred and no witness says otherwise. Even considering the evidence in the light most favorable to Burgess, a jury, according to Goldstein, could not reasonably base its decision on such speculative inferences.

2.

Goldstein also argues that the Lehmann Note does not provide sufficient evidence to support the jury's withholding verdict. Burgess argued at trial that the note's "Child Bryan? Witnes[s] 'get down basement'" language indicates Goldstein had information that Brian Rainey was awake and that its "[t]hinks a guy named 'Little Man.' Mother-in-Law got a call from jail saying 'Little Man['] did it" language indicates that someone nicknamed Little Man might be an alternative suspect. J.A. 2517. Burgess argued Goldstein failed to disclose this information to the prosecutor and, thus, to him.

In support of his Rule 50 motion, Goldstein asserts there is no evidence that the note was withheld from the prosecutor or defense counsel. In fact, he contends the evidence shows the information was disclosed. Specifically, he points to his testimony that it was his practice to copy his entire file. He also points to a note from the prosecutor's file that said "brother—back room by himself—Sabein — told mother to go to basement." J.A. 2366. This note, Goldstein argues, proves the prosecutor had the information about Brian, meaning he either did not withhold it or, even if he did, there was no prejudice.

16

3.

Goldstein's arguments are compelling. Indeed, Burgess' case here appears thin. But thin evidence is not the same as no evidence. And under our standard of review, we are required to construe the evidence in the light most favorable to Burgess and to draw reasonable inferences in his favor. If we do that, we conclude that Burgess introduced enough evidence from which the jury could have inferred that Goldstein interviewed Brian, who told him that he saw a man who was not Burgess enter the home, and that, despite this knowledge, Goldstein wrote that all the children were asleep during the murder. That evidence includes the testimony of Brian and Tawanda about being interviewed by the officers and the testimony of Goldstein and the other officers that, if the children were interviewed, Goldstein would have been involved. Goldstein is correct that Brian and Tawanda said the interviewing officer was uniformed and he was not. But the jury could have reasonably believed that either the children, who were very young at the time, were mistaken on this issue or that, even if Goldstein was not uniformed, the officers with him were.

Burgess also offered enough evidence from which the jury could have inferred that another officer interviewed Brian and that the officer relayed that information to Goldstein, who wrote that the children were asleep despite knowledge otherwise.[4] All the officers

---

[4] Burgess must also introduce evidence from which a jury could reasonably conclude Goldstein withheld evidence in bad faith. Bad faith means that an officer "intentionally withheld the evidence for the purpose of depriving the plaintiff of the use of that evidence during his criminal trial." *Jean v. Collins*, 221 F.3d 656, 663 (4th Cir. 2000). We find no reversible error in the district court's conclusion that the evidence of Brian's

testified that the BPD policy called for Goldstein to receive information about any such interviews. While it is correct that all the officers who testified denied interviewing the children, Brian and Tawanda testified that they were interviewed and not all the officers on the scene testified.

Further, the Lehmann Note constitutes additional evidence that, along with inferences from it, support Burgess' argument. Regardless of the strength or weakness of this evidence, the jury could have reasonably relied on it to reach its decision.

In addition, Burgess impeached Goldstein throughout the trial. Pointing out just a few examples, Burgess established that Goldstein's trial testimony differed from his deposition testimony, that he failed to document parts of the investigation he claimed to have conducted and that his investigation failed to comply with police best practices. The jury, therefore, could have been persuaded by these attacks on Goldstein's credibility and rejected some or all of his testimony.

Of course, there was evidence from which the jury could have rejected both conclusions Burgess advances. But under our standard of review, it is not our job to weigh the evidence or judge credibility. "On such appellate review we determine if a reasonable jury could have found the verdict." *First Union Commercial Corp.*, 411 F.3d at 556. Here, our standard of review compels the conclusion that a reasonable jury could have agreed with Burgess.

---

exculpatory testimony is of such a nature that it can "negate any innocent explanation for the Defendant's withholding." J.A. 2122.

## B.

We next consider Goldstein's argument that the district court erred in declining to grant a directed judgment on the fabrication claim. "We have recognized a due process right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigating capacity." *Massey v. Ojaniit*, 759 F.3d 343, 354 (4th Cir. 2014) (internal quotation marks and citation omitted). But fabrication of evidence alone is not sufficient to state a claim for a due process violation as "a plaintiff must plead adequate facts to establish that the loss of liberty—i.e., his conviction and subsequent incarceration—resulted from the fabrication." *Id.*

The fabrication claim that went to the jury was Burgess' assertion that Goldstein created a false police report stating that all of the victim's children were asleep at the time of the murder in order to hide Brian's existence as a potential exculpatory witness, meaning that Goldstein knew that Brian was in fact awake at the time of the murder. Largely repeating the arguments described in our analysis of the withholding claim, Goldstein argues Burgess failed to produce evidence on which a reasonable jury could rely to support its verdict.

We need not repeat the discussion about this evidence contained in our analysis of Burgess' withholding claim. As noted, the evidence that Goldstein learned Brian was awake and saw that an intruder that was not Burgess is hardly robust. But, for the same reasons we described in the previous section, we conclude that there was sufficient evidence from which the jury could have concluded that Brian told a police officer that Burgess was not involved in the crime on the night of the murder. And if there is sufficient

19

evidence of that fact, by extension, there was sufficient evidence from which a jury could conclude that Goldstein fabricated the report indicating otherwise.[5]

## C.

In affirming the district court's denial of Goldstein's Rule 50 motion, we emphasize the importance of the jury's role in trials, a role enshrined in the Seventh Amendment. That role is, of course, important in any trial. It is even more important in trials, like the one here, that boil down to credibility determinations. The jury here was tasked with making a number of difficult credibility decisions. It had to decide what testimony to believe and what to reject. It had to decide how the various pieces of evidence offered over the course of a ten-day trial fit together. It did this with a front row seat to the testimony offered by the witnesses. From that vantage point, the jury was able to examine not only the words

---

[5] Goldstein also appeals the district court's denial of his Rule 50 motion with respect to Burgess' malicious prosecution and state law intentional infliction of emotional distress ("IIED") claims. Goldstein argues that because the evidence presented at trial was insufficient to support the jury's conclusions that Goldstein fabricated and withheld evidence, it was also insufficient to support the verdict on these claims. Appellant's Br. at 35. But, the evidence and claims are linked, just as the district court suggested in explaining that the IIED claim "rises and falls" with the claims concerning the constitutional violation. J.A. 1889. And while we have noted that it is "not entirely clear whether the Constitution recognizes a separate constitutional right to be free from malicious prosecution . . . if there is such a right, the plaintiff must demonstrate both an unreasonable seizure and a favorable termination of the criminal proceeding flowing from the seizure." *Snider v. Seung Lee*, 584 F.3d 193, 199 (4th Cir. 2009) (citing *Lambert v. Williams*, 223 F.3d 257 (4th Cir. 2000)). To prove his state law claim for Maryland IIED, Burgess had to show that Goldstein's conduct was intentional or reckless; the conduct was extreme and outrageous; a causal connection between the wrongful conduct and the emotional distress; and that the emotional distress was severe. *Harris v. Jones*, 380 A.2d 611, 614 (Md. 1977). At this juncture, we review evidence in the light most favorable to Burgess and draw all reasonable inferences in his favor. Doing that, the record contains sufficient evidence to support the jury's verdict on both of these claims.

the witnesses said, but also how they said them—their facial expressions, their body language, their pauses, their mannerisms and all the other intangible factors that are present in a trial. In contrast, we, reviewing words on a transcript many years after they were spoken, lack the ability to appreciate those factors. For that important reason, we disturb a jury's factual determinations only if they lack evidentiary support. *United States v. Shipp*, 409 F.2d 33, 36 (4th Cir. 1969) ("[W]here the evidence is in conflict, the jury's opportunity to observe the witnesses' demeanor is especially important in judging credibility."). Here, we conclude that the evidence offered by Burgess was sufficient for a reasonable jury to conclude as it did on the withholding and fabrication claims.

IV.

We next turn to Goldstein's appeal of the district court's denial of his Rule 59 motion. Goldstein argues that the district court erred in denying his motion under Federal Rule of Civil Procedure 59 because the evidence presented is legally insufficient to support liability. Alternatively, he argues that he is entitled to a new trial, relying primarily on his arguments put forth as to the Rule 50 motion and a list of other points he believes the jury unreasonably inferred.

The district court, in great detail, addressed Goldstein's claim for a new trial based on the verdict being against the clear weight of the evidence, the result of errors of law and based on false evidence. Concluding that the fabrication claim rises and falls with whether or not Burgess produced sufficient evidence of Goldstein's knowledge of Brian's eyewitness account, it also found the jury's verdict on the fabrication claim was not against

21

the clear weight of evidence. For similar reasons, it concluded that the jury's verdict on the IIED and malicious prosecution claims could stand. Goldstein's challenge fails to address the substance of the order denying Rule 59 relief or provide more than a threadbare argument as to why the verdict against Goldstein was against the clear weight of the evidence.

"The decision to grant or deny a new trial rests with the sound discretion of the district court, and we review this decision for a clear abuse of discretion." *Bristol Steel & Iron Works v. Bethlehem Steel Corp.*, 41 F.3d 182, 186 (4th Cir. 1994). Consistent with that, the district court's action in granting or refusing a new trial is "not reviewable upon appeal, save in the most exceptional circumstances." *Young v. Int'l Paper Co.*, 322 F.2d 820, 822 (4th Cir. 1963). This is so because the district court judge is in the best position to see the witnesses and is intimately familiar with the trial from a perspective this Court cannot have. *Bristol Steel*, 41 F.3d at 186.

Outside of suggesting that the judge and jury were motivated by sympathy and bias, noting that Thanksgiving holiday was looming and that the judge came down to apologize to Burgess, Goldstein has presented scant evidence in support of his arguments. Appellant's Br. at 37. Goldstein fails to address the substance of the district court's ruling and provides no authority for his bare claims other than simply to cite the rule.[6] We are

---

[6] Because of this, we would be well within our discretion and authority to find this argument forfeited in its entirety. *Li v. Gonzales*, 405 F.3d 171, 175 n.4 (4th Cir. 2005) ("Because this section of Li's brief contains no citation to legal authority, Li forfeited the argument."); *see also* Fed. R. App. P. 28(a)(8)(A) (noting that the appellant's brief must contain, inter alia, "citations to the authorities . . . on which the appellant relies.").

convinced from a review of the record that the district court was within in its discretion in denying the motion. Thus, we find no error here.

V.

Next, we consider Goldstein's argument that the district court erred in refusing to instruct the jury not to consider information about Howard Rice regarding Burgess' withholding claim. Specifically, Goldstein argues that, without the instruction it requested, the jury instructions allowed the jury to consider a theory of liability on which the district court had already awarded Goldstein summary judgment.

Recall that the district court granted partial summary judgment in favor of Goldstein as to Burgess' *Brady* claim related to pretrial Howard Rice evidence. The district court agreed with Goldstein that there were no genuine issues of material fact related to Burgess' *Brady* claim for the withholding of information related to Rice as an alternative suspect because Burgess already knew about Rice's potential relevance. The court also noted that Burgess failed to identify what piece of evidence related to Howard Rice Goldstein withheld. For that reason, the court granted Goldstein's motion for summary judgment as to Burgess' *Brady* claim related to pretrial Howard Rice evidence.

Later, at a jury charge conference, Goldstein sought an instruction to the jury that there were no pretrial Howard Rice claims. Goldstein insisted:

> [A]t some point in the jury instruction process, the jury needs to be made aware of this Court's ruling on summary judgment so that they don't go astray, which probably would not be reflected on the jury verdict form, and find, for example, that there is a *Brady* violation because Little-Man wasn't disclosed, or there was a violation because Howard Rice wasn't disclosed.

23

This Court has already ruled on those issues. Those cannot be put to the jury . . . .

J.A. 1916–17.

To that end, Goldstein submitted additional proposed jury instructions to the court. Specifically, he sought an instruction on "Claims Not to Be Considered" indicating that certain claims have been determined as a matter of law not to be a part of this case including "whether the Defendant(s) at any time withheld exculpatory information relating to Howard Rice." J.A. 1659. The district court declined the proposed instruction, noting that the parties could argue their point about the instruction given on appeal and that the argument was preserved. The jury was ultimately instructed that:

> As to the first and second claims, the due process claims, concealment and fabrication, which is in Court's Instruction Number 14, the Plaintiff's first and second claims allege that the Defendant violated his Federal and State Constitutional due process right to a fair trial by, one, failing to disclose exculpatory evidence -- namely, that Brian Rainey was an exculpatory witness, other exculpatory information provided by the FBI as recited in Plaintiff's Exhibits 121 and 122, as well as the information in Plaintiff's Exhibit 372 [the Lehmann Note]-- that was material to the Plaintiff's defense in the criminal case.

J.A. 1999-2000.

Goldstein argues that Burgess capitalized on the instructions by arguing during closing that Goldstein was liable for withholding information about Howard Rice as an alternative suspect even though the district court had previously dismissed that claim. Looking at the closing arguments, Burgess emphasized that there was evidence of an alternate suspect who the Lehmann Note called "Little-Man." J.A. 1978. Burgess continued:

24

> [Y]ou've heard a lot of evidence about Little-Man. Little Howard. You know, he had a very small stature. He was going around in the neighborhood killing everybody.
>
> And that's what Mr. Dyson also told the police. He told the police that he liked to wear disguises. Remember his testimony? He said Little-Man likes to wear disguises. Well, there was Little Howard who was running around the neighborhood who killed nine people in a two-year period in a less than three-mile area, who liked to wear disguises.

J.A. 1979. Burgess added that in regard to Dorsey, the confessed killer, that "it [was] not in his self-interests to admit to him and Howard Rice killing this woman unless it was actually true."[7] J.A. 1985.

To be sure, Burgess conflated the names Howard Rice, Little Howard and Little Man in a manner that may have blurred the line between them and arguably confused the identity of the individuals. And this may have been what counsel for Goldstein was concerned about all along when she sought a clarifying instruction as to the pre-trial Howard Rice claims. We appreciate this concern. But importantly, this potential confusion did not begin with Burgess' closing argument. In fact, Burgess, in his opening statement, discussed the Lehmann Note, indicating that "Little-Man was little Howard Rice, who had been shooting everybody in the neighborhood." J.A. 636. And Goldstein told the jury the opposite in opening: "You will find out during this trial we have no idea who Little-Man is. There is not a single document you will see in this case that refers to Howard Rice as Little-Man. He was not Little-Man. If he ever went by a nickname, which is disputed by some people who knew him, it was Little Howard . . . ." S.A.74.

---

[7] The record is not clear whether Dorsey's confession indicated that he and Rice were both involved in the murder although Burgess' counsel argued that during closing and further suggested as much before this Court.

This continued during the testimony of the witnesses. Goldstein elicited testimony from several witnesses about Little Man. Burgess testified that he did not know Little Man's real name but knew a different person named Howard Rice. Troy Williams, a former boyfriend of Dyson, testified that he had never heard Howard Rice referred to as Little Man. Goldstein testified that Little Man and Howard Rice were two different people. And another BPD detective testified that Howard Rice's nickname was Little Howard.

These repeated references to Little Man and Howard Rice before closing undermine Goldstein's arguments. First, he did not object to these references. Second, how could the references to Little Man and Howard Rice in Burgess' closing have been prejudicial in light of so many references earlier in the trial?

Further, it is important to remember the allegation of error on appeal relates not to the closing arguments but to the district court's jury instructions. We review the decision to give or not give a jury instruction, and the content of an instruction, for abuse of discretion. *United States v. Savage*, 885 F.3d 212, 222–23 (4th Cir. 2018). When jury instructions are challenged on appeal, the key issue is "whether, taken as a whole, the instruction fairly states the controlling law." *United States v. Cobb*, 905 F.2d 784, 789 (4th Cir. 1990). A district court will be reversed for declining to give an instruction proposed by a party only when the requested instruction "(1) was correct; (2) was not substantially covered by the court's charge to the jury; and (3) dealt with some point in the trial so important, that failure to give the requested instruction seriously impaired that party's ability to make its case." *Noel v. Artson*, 641 F.3d 580, 586 (4th Cir. 2011) (internal quotation marks and citation omitted).

26

Goldstein argues that by refusing to instruct the jury that Howard Rice information could not be considered a source of withheld *Brady* information, the district court effectively vacated its own summary judgment ruling because the lack of this instruction allowed Burgess to argue his Howard Rice theory by the backdoor of "Little Man." But when presented with this issue in the context of the post-trial motions, the district court concluded that there had been no violation of its summary judgment order.

The district court's decision merits deference, as it would be in the best position to make this determination. *See JTH Tax, Inc. v. H & R Block E. Tax Servs., Inc.*, 359 F.3d 699, 705 (4th Cir. 2004) ("When a district court's decision is based on an interpretation of its own order, our review is even more deferential because district courts are in the best position to interpret their own orders."). And our review of the summary judgment order reveals that, overall, the district court's decision was correct. In fairness to Goldstein, at the beginning of the Howard Rice discussion, the order provides "'Little Man' (an alleged nickname for Howard Rice)." J.A. 532. But the district court was summarizing Burgess' allegations, not purporting to make a factual finding. The court's analysis talks only about "Howard Rice." *Id*. at 533. And in granting Goldstein's motion for summary judgment, it refers to "pretrial Howard Rice evidence" without any reference to "Little Man." *Id*. Thus, while the district court could have been more precise in the summary judgment order, we agree that order was not violated.

Further, the district court's decision to admit the Lehmann Note into evidence provides additional support. As described above, the note expressly referenced Little Man. If the district court intended its ruling about Howard Rice to include Little Man, why would

27

it have admitted the Lehmann Note? Of course, the court's decision to admit the Lehmann Note could have related in part to other contents of the note—namely "Child Bryan? Witnes[s] 'get down basement.'" J.A. 2517. But if it intended to bar any evidence about Little Man from trial in its summary judgment ruling, the district court would likely have taken some measure to address the Little Man reference in the Lehmann Note. For example, it could have ordered the Little Man reference to be redacted. Or it could have issued a limiting instruction about that reference. The fact that it did not adds support for its denial of Goldstein's post trial motion concerning the jury charges.

In addition, the instruction requested by Goldstein was substantially covered by the court's charge about the relevant legal issues. Consequently, there was no need for the judge to draw attention to a particular piece of evidence or claim or to dissect the Lehmann Note for the jury when the note in fact said nothing about Howard Rice in the first place. *See generally Benjamin v. Sparks*, 986 F.3d 332, 350 (4th Cir. 2021) ("We recognize that district courts are often well-advised not to comment on specific evidence in their jury instructions."). Further, the jury was instructed that what a lawyer says in his opening or closing statements is not evidence. In sum, the instructions fairly stated the controlling law.

Finally, the failure of the court to give the requested instruction did not materially impair Goldstein's ability to make his case. For example, at various points during the trial, Goldstein distinguished between Little Man and Howard Rice.

Bottom line, Goldstein's real complaint seems to be about Burgess' counsel's closing argument. But whether or not he has a valid complaint, he does raise that issue on

appeal. Instead, the issue for us is the district court's jury instructions. And, while we acknowledge this issue, like all the issues before us, is close, we find no reversible error.[8]

VI.

Finally, we turn to Goldstein's argument that the district court erred in admitting the FBI Notes. To assess this argument, we begin with a description of what the notes contain. They list "ITAR-Drug-Related Murders" in the subject line and reference the "Murder of Michelle Dyson." J.A. 2509-10. They also indicate that three subjects were involved in the Dyson murder. They reference Dyson's babysitter and other potential witnesses with knowledge about the details and motives regarding the murder. The notes list one of Dyson's old boyfriends, an individual who drives a white Pathfinder truck, as either a suspect or a witness with potential exculpatory information and suggest that Dyson was killed because of drug-related problems. They indicate that the author of the notes, who importantly is not identified, passed this information on to a detective of the BPD-Homicide Unit at the phone number (410) 396-2116. The notes provide that the detective who provided the information "is the case detective and he advised that the information appeared to be accurate and resulted in leads on the case." J.A. 2509. They also indicate that "[o]n 11/8/94, after 2130 hours, Det. [Redacted], the case detective, BPD Homicide

_____

[8] Burgess insists an additional reason to affirm the district court on the jury instruction issue is that Goldstein did not contemporaneously object to the Little Man references during closing. However, Goldstein contends the district court directed the parties not to object during closing arguments. Without the full record of the court's directives before us, we decline to rely on any failure of Goldstein to object during closing.

Unit (410) 396-2116 was provided with the above-stated information." J.A. 2510. However, the name of the BPD official with whom the author of the FBI Notes spoke is redacted.

Burgess argues now, as he did at trial, that the FBI Notes establish Goldstein had and withheld this exculpatory information. To support this position, he asserts that the FBI Notes state that the information was provided to the "case detective" at the "BPD-Homicide Unit," whom trial testimony established to be Goldstein for the Dyson murder. Thus, according to Burgess, the jury could have reasonably concluded that Goldstein received exculpatory information but failed to disclose it to the prosecutor or to Burgess.[9]

Goldstein argues that the evidence did not show that he ever received the FBI information. He denies ever being contacted by the FBI and insists that the phone number in the note was not the main BPD homicide line where he could be reached.

But, as a threshold matter, Goldstein also argues that the FBI Notes should not have been admitted at all. More specifically, he argues that the district court abused its discretion in admitting them under Federal Rule of Evidence 807's residual exception and denying

---

[9] Burgess also argues that Goldstein's notes track the contents of the FBI memos to an extent that confirms he received the information from the FBI. Goldstein's handwritten notes do, in fact, contain two pieces of information that also appear in the FBI notes: his notes reference "Troy Williams," an "old boyfriend" who "works at 'Hair Dimension' Sinclaire Lane Shopping Center," and "Barbara BIF 20's babysitter" who "did Michelle's nails [and] lives near Michelle's old address" as well as telephone numbers and addresses of three other individuals. J.A. 2484. In response, Goldstein counters that it is not logical to infer that he received the FBI Notes simply on the basis that his handwritten notes contain similar information, as the information was obtained independently. Appellant's Br. at 30–33.

30

Goldstein's motion to exclude the FBI Notes as inadmissible hearsay. We now consider Goldstein's hearsay challenge.

We review a trial court's ruling on the admissibility of evidence for abuse of discretion. *United States v. Cole*, 631 F.3d 146, 153 (4th Cir. 2011). We will overturn an evidentiary ruling only if it is arbitrary and irrational, and we will look at evidence in the light most favorable to the proponent, "maximizing its probative value and minimizing its prejudicial effect." *Id.* (quoting *United States v. Udeozor*, 515 F.3d 260, 265 (4th Cir. 2008)).

The district court found that much of the information contained in the FBI Notes was not hearsay. It found that such information was not offered for the truth of the matter asserted. Indeed, it agreed with Burgess that the FBI Notes were admitted primarily to show notice to Goldstein of potential exculpatory information, not to prove who actually murdered Dyson. But the court acknowledged that the portions of the notes that said the FBI contacted the BPD's lead detective were offered for the truth of the matter asserted and, thus, were hearsay. Even so, it admitted the hearsay portions of those notes under Rule 807, finding that there was a "strong indicia of reliability" that the information was furnished by the FBI to the BPD. J.A. 626. The district court also found that the adverse party, Goldstein, received the notice required by Rule 807.

In reviewing Goldstein's post-trial motions, the district court addressed Goldstein's challenge to the admission of the FBI notes again, this time with particular attention to the notice requirement. It reiterated its earlier ruling that admitting the notes complied with the spirit and purpose of Rule 807(b)'s notice requirement. The district court also found that

31

the FBI Notes bore "circumstantial guarantees of trustworthiness" because they were produced pursuant to a subpoena and recorded near contemporaneous communications among law enforcement agencies. J.A. 2138.

In reviewing this decision, we begin with Rule 807, titled the "Residual Exception."[10] Rule 807 creates a hearsay exception for certain statements not covered by any exceptions in Rules 803 or 804. Fed. R Evid. 807. For a statement to be admissible under Rule 807, it must contain "guarantees of trustworthiness," and be "more probative on the point for which it is offered than any other evidence" available through "reasonable efforts." *Id.*

---

[10] At the time of the hearing and trial, the Rule provided as follows:

(a) In General. Under the following circumstances, a hearsay statement is not excluded by the rule against hearsay even if the statement is not specifically covered by a hearsay exception in Rule 803 or 804:

(1) the statement has equivalent circumstantial guarantees of trustworthiness;

(2) it is offered as evidence of a material fact;

(3) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and

(4) admitting it will best serve the purposes of these rules and the interests of justice.

(b) Notice. The statement is admissible only if, before the trial or hearing, the proponent gives an adverse party reasonable notice of the intent to offer the statement and its particulars, including the declarant's name and address, so that the party has a fair opportunity to meet it.

Fed. R. Evid. 807 (2017).

Goldstein contends that Burgess failed to provide notice of the declarant's name and address under Rule 807(b).[11] Appellant's Br. at 39. Generally, we require strict compliance with the notice provision. *See United States v. Heyward*, 729 F.2d 297, 299 n.1 (4th Cir. 1984). For example, in *United States v. Mandel*, we held that "[w]ith respect to those statements where the declarant is unidentified, the government has not met the notice requirement because the names and addresses of the declarants were not given." 591 F.2d 1347, 1369 (4th Cir. 1979). We found "no reason to depart from [the rule's] plain requirements" even though the possible declarants were limited to members of the Maryland Senate. *Id.*; *but cf. United States v. Squillacote*, 221 F.3d 542, 563–64 (4th Cir. 2000) ("While there may be cases where the inability to identify the declarant of an alleged co-conspirator's statement could render the statement inadmissible, this is not one of those cases. The HVA documents were sufficiently connected to each other and to the conspiracy established by the government's evidence to make them reliable and admissible under Rule 801(d)(2)(E), notwithstanding the government's inability to identify the declarants."); *see also United States v. Simmons*, 773 F.2d 1455, 1458–59 (4th Cir. 1985) (concluding that firearm trace forms of the Bureau of Alcohol, Tobacco and Firearms were properly admitted into evidence under predecessor Rule 807 as there was no reason for the weapons' manufacturers to falsify entries on routine forms).

Burgess never identified the name of the declarant, much less the address of the declarant. Of course, the FBI Notes indicate that the declarant is with the FBI. But merely

---

[11] The requirement that prior notice of the declarant's address has since been deleted from the current version of the Rule effective 2019 amendments.

identifying the organization with whom the declarant works is not enough. Burgess did not provide the notice the Rule required—"reasonable notice of the intent to offer the statement and its particulars, including the declarant's name and address. . . ." Fed. R. Evid. 807(b) (2017). For this reason, we agree with Goldstein that the district court erred in admitting the FBI Notes.

But this does not end the inquiry. We must now consider whether the error was harmless. *See United States v. Cone*, 714 F.3d 197, 219 (4th Cir. 2013) ("Evidentiary rulings are subject to harmless error review . . . ."). "[T]he test for harmlessness is whether we can say with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Smith v. Baltimore City Police Dep't*, 840 F.3d 193, 200–01 (4th Cir. 2016) (internal quotation marks and citation omitted).

The FBI Notes were certainly important evidence. In fact, in the jury instruction conference, the district court commented on the importance of the documents. *See* J.A. 1917 ("When all is said and done, this whole case is going to hinge on [Goldstein's notes and the FBI Notes], among other things.") And in closing, Burgess' counsel discussed the FBI Notes in identifying the evidence Goldstein withheld, even suggesting it alone provided the basis for a verdict in favor of Burgess. After discussing the notes, he argued "[t]his case is over. I mean, I could stop talking now, and we could all go to lunch early, but I'm going to keep talking. But all we have to prove is that exculpatory evidence was withheld, and we've already proved it." J.A. 1975. In addition, as already noted, Burgess' withholding claims based on Brian and the Lehmann Note were thin. In that context, we

34

do not minimize the importance of records from a well-known and generally respected governmental organization like the FBI.

But after considering the record as a whole, we conclude that the admission of the FBI Notes here was harmless. At the most basic level, the FBI Notes were one piece of evidence from a two-week trial. While by no means determinative, that fact alone militates in favor of harmlessness.

However, there are other reasons. First, as noted, most of the content of the documents was not offered for the truth of the matter asserted. J.A. 2135 ("At the hearing, the Court established that the vast majority of the information contained in the documents was offered to prove notice to the BPD rather than for the truth of the matters asserted therein."). Second, the portion of the notes that was offered for the truth of the matter asserted—that the FBI provided the information in the notes to the case detective—also came in through an alternative source which, interestingly enough, was Goldstein. In disputing Burgess' argument that his notes show he received the information from the FBI, Goldstein insisted that he independently developed some of the information contained in the FBI Notes without the FBI's help. Thus, Goldstein's own testimony was an alternative source for the portion of the FBI notes which was admitted under Rule 807—that he had information about alternative suspects of the murder. So, even accepting Goldstein's arguments that he did not receive any information from the FBI, he would still be obligated to turn over the information about alternative suspects that he independently developed. Accordingly, the court's error was not prejudicial to Goldstein. Third, as explained above, Burgess argued that Goldstein withheld multiple pieces of exculpatory evidence, only one

35

of which was the FBI Notes. And as we have already decided, the jury's verdict could be upheld in light of Brian and his sister's testimony and the Lehmann Note without the admission of the FBI notes. Finally, the district court concluded there was no "miscarriage of justice" where the FBI Notes could have been admitted as business and public records under Rules 803(6) and 803(8). J.A. 2138.

In conclusion, the district court erred in admitting the FBI Notes under Rule 807. Despite that, looking at the entire record, "we can say with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Smith*, 840 F.3d at 201 (quoting *United States v. Madden*, 38 F.3d 747, 753 (4th Cir. 1994)). Therefore, the district court's error was harmless and provides no basis for the relief Goldstein seeks. *See Benjamin*, 986 F.3d at 346 ("Even if the district court errs in admitting evidence, this Court will not reverse if the error was harmless and had no prejudicial affect.").

VII.

Last, we turn to Burgess' cross-appeal. Burgess argues the district court erred in dismissing its *Monell* claim. For background, after we dismissed Goldstein's initial appeal for lack of jurisdiction and remanded to the district court for resolution of the *Monell* claim, the district court dismissed that claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. It held that Burgess could not obtain additional relief from the *Monell* claim because he had already been awarded compensatory damages and did not seek equitable relief. The court further concluded that no such equitable relief would be appropriate in

36

this case given that the constitutional deprivations at the heart of this matter occurred over twenty-five years ago and because the evidence presented at trial does not support submission of the count to the jury.

In reviewing this dismissal, we begin with the elements of a *Monell* claim. Because municipal liability under § 1983 cannot be predicated solely upon a respondeat superior theory, liability arises only where city employees take constitutionally offensive acts in furtherance of municipal policy or custom. *Milligan v. City of Newport News*, 743 F.2d 227, 229 (4th Cir. 1984). Burgess alleges that Goldstein's actions were taken pursuant to policies and practices of the BPD, City Council or Mayor including the failure to adequately train, supervise and discipline officers who engaged in constitutional violations. The policies and practices alleged also included failure to turn over exculpatory evidence and to rely on fabricated evidence.

In assessing whether those allegations are adequate, "[t]he purpose of a Rule 12(b)(6) motion is to test the sufficiency of a complaint; importantly, [a Rule 12(b)(6) motion] does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Edwards v. City of Goldsboro*, 178 F.3d 231, 243–44 (4th Cir. 1999) (internal citation and quotation marks omitted). We review dismissals under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim de novo, viewing the facts in the light most favorable to the plaintiff. *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008).

Applying that standard, earlier in the case, the district court denied BPD's motion to dismiss the *Monell* claim, finding that BPD's argument placed too high a burden on

37

Burgess to plead a claim. It concluded that Burgess' allegations sufficiently pled a policy or practice of withholding and/or fabricating evidence and allowed the claim to proceed. In a second order, the district court granted BPD's motion to bifurcate and stay discovery to allow claims against the officer defendants to be resolved in a first trial and claims against BPD to be resolved in a second trial if necessary. After we dismissed Goldstein's initial appeal for lack of jurisdiction and remanded for resolution of the *Monell* claim, the district court opted to dismiss the *Monell* claim. The district court does not explain why the allegations of the complaint that were sufficient earlier no longer were. Instead, the district court's dismissal seems based on the verdict issued against Goldstein. The verdict is, of course, an important development since the district court's earlier rulings. It is correct that the City of Baltimore indicated that it would indemnify Goldstein with respect to any judgment if there was an affirmance. *See* J.A. 2209. But it has not yet done so. If, in light of our decision today, the City does in fact indemnify Goldstein and the judgment is satisfied, it may be that Burgess would have received all the relief to which he is entitled and, thus, the *Monell* claim would be moot. But until then, it is not. For this reason, we reverse the district court's dismissal of Burgess' *Monell* claim.

VIII.

We have pored over this record from this complex two-week trial as well as the parties' briefs. From that review, it is clear that behind all the arguments, this is a case which rises and falls on the credibility of a few key witnesses. As we have consistently held, triers of fact are tasked with making credibility determinations. *Shipp*, 409 F.2d at 36

38

("It is a truism deeply rooted in juridic experience that where the evidence is in conflict, the jury's opportunity to observe the witnesses' demeanor is especially important in judging credibility.") For this reason, appellate courts have acknowledged both the role of the jury in observing witnesses in the first instance, and the trial judge, "vested with broader power" who "may in his discretion set the verdict aside and grant a new trial if he thinks the verdict is against the weight of the evidence." *Id.*

We have also recognized the trial court's power to make evidentiary decisions, to inform the jury of relevant issues and legal principles, and to manage other aspects of a jury trial. *See generally Benjamin*, 986 F.3d at 337. "[T]he abuse of discretion standard requires a reviewing court to show enough deference to a primary decision-maker's judgment that the court does not reverse merely because it would have come to a different result in the first instance." *Id.* at 345 (internal citation and quotation marks omitted); *see also McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 554 (1984) ("[I]t is well-settled that the appellate courts should act in accordance with the salutary policy embodied in Rule 61.")[12]

These important principles guide our decision today. For the foregoing reasons, we affirm the jury verdict upheld by the trial court. However, we reverse the trial court's

---

[12] Federal Rule of Civil Procedure 61 provides: "Unless justice requires otherwise, no error in admitting or excluding evidence—or any other error by the court or a party—is ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order. At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights." Fed. R. Civ. P. 61.

dismissal of the remaining *Monell* claim in this action and remand for further proceedings consistent with this opinion.

*AFFIRMED IN PART, REVERSED IN PART AND REMANDED*